**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**In re:**

                                                 **Chapter 11**

**BUSH INDUSTRIES, INC.,**

                                                 **Case No.: 04-12295**

                            **Debtor.**

_____    **Hon. Carl L. Bucki, U.S.B.J.**

# SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE PLAN OF REORGANIZATION OF BUSH INDUSTRIES, INC.

**HODGSON RUSS LLP**
**Attorneys for Debtor and**
**Debtor in Possession**
One M&T Plaza, Suite 2000
Buffalo, New York 14203
(716) 856-4000
(716) 849-0349 - fax

**Garry M. Graber, Esq.**
(716) 848-1273
ggraber@hodgsonruss.com

**Cheryl R. Storie, Esq.**
(716) 848-1275
cstorie@hodgsonruss.com

**Stephen L. Yonaty, Esq.**
(716) 848-1415
syonaty@hodgsonruss.com

Dated: June 22, 2004

Bush Industries, Inc. (the "Debtor"), in accordance with section 1125 of the United States Bankruptcy Code, provides the following Disclosure Statement (the "Disclosure Statement") with respect to its annexed Plan of Reorganization (the "Plan"), to the holders of Claims against and Interests in the Debtor, for the purpose of providing information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of such Claims or Interests to make an informed judgment about the Plan.

**THE BOARD OF DIRECTORS OF THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS. ALL CREDITORS ENTITLED TO VOTE ARE URGED TO VOTE IN FAVOR OF THE PLAN. A SUMMARY OF THE VOTING INSTRUCTIONS IS SET FORTH BELOW. MORE DETAILED INSTRUCTIONS ARE CONTAINED IN THE BALLOT DISTRIBUTED TO CREDITORS ENTITLED TO VOTE ON THE PLAN. TO BE COUNTED, ALL BALLOTS MUST BE DULY COMPLETED AND RECEIVED ON OR BEFORE JULY 27, 2004 AT 9:00 A.M. OR SUCH OTHER DATE AS MAY BE INDICATED ON THE BALLOT (THE "VOTING DEADLINE").**

**HOWEVER, THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OPPOSES THE PLAN BECAUSE IT BELIEVES THAT THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE CONTAINED IN SECTION 1129(b) OF THE BANKRUPTCY CODE.**

The Equity Committee expects to object to confirmation of the Plan on the grounds that it believes the Plan violates §1129(b) of the Bankruptcy Code based upon the allegation that holders of Class 3 Claims are receiving in excess of 100% of their claims plus accrued interest under the Plan while Class 5 Interests in the Debtor are being improperly extinguished.

No person is authorized by the Debtor to give any information or to make any representation about the Plan other than as contained in this Disclosure Statement, the exhibits attached hereto and the documents referred to herein, and any such information or representation may not be relied upon as having been authorized by the Debtor. The summaries of the Plan and the other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and documents described therein.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtor, the historical, projected and budgeted financial information regarding the Debtor and the liquidation analysis relating to the Debtor, is included for purposes of soliciting acceptances of the Plan but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations but rather as statements made in settlement negotiations.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN.**

# TABLE OF CONTENTS

Page:

I. EXECUTIVE SUMMARY ...................................................................................................1

II. OVERVIEW OF THE PLAN .............................................................................................2
    A. General Information Concerning Treatment of Claims and Interests....................................2
    B. Cramdown of Class 5 Interests and Class 6 Subordinated Claims ......................................2
    C. Effective Date..........................................................................................................................2
    D. Summary of Classes and Treatment of Claims and Interests................................................2
        No property will be distributed to or retained by the holders of Subordinated Claims in Class 6 on account of such Claims. As set forth in Article IX, the Debtor requests confirmation under section 1129(b) of the Bankruptcy Code with respect to Class 6. ...........5
    E. Funding of Plan, Exit Financing............................................................................................5
    F. Sources and Uses of Cash......................................................................................................5
    G. Treatment of Administrative Claims, Priority Tax Claims, DIP Facility Claims and Intercompany Claims ..................................................................................................................6
        1. Administrative Claims ........................................................................................................6
        2. Priority Tax Claims............................................................................................................8
        3. DIP Facility Claims...........................................................................................................8
        4. Intercompany Claims .........................................................................................................9
    H. Securities To Be Issued Under the Plan.................................................................................9
    I. Conditions to Confirmation and the Effective Date of the Plan.............................................9
        1. Conditions to Confirmation ...............................................................................................9
        2. Conditions to the Effective Date........................................................................................9
        3. Waiver of Conditions to Confirmation or Effective Date................................................10
        4. Effect of Nonoccurrence of Conditions to Effective Date...............................................10

III. BACKGROUND OF DEBTOR AND EVENTS LEADING TO CHAPTER 11 .................10
    A. BACKGROUND .................................................................................................................10
        A. Bush Industries of Pennsylvania, Inc.;.............................................................................11
        B. Bush Industries of Ohio, Inc.; ..........................................................................................11
        C. Bush Management, Inc.;.....................................................................................................11
        D. Bush Service Group, Inc.;..................................................................................................11
        E. Bush Industries, DE Mexico, SA, DE, C.V.; ...................................................................11
        F. Bush Commercial DE, SA, DE, C.V.;...............................................................................11
        G. The Color Works, Inc.; .....................................................................................................11
        H. Fournier, Inc.;....................................................................................................................11
        I. Hydro Grafix, Inc.; ............................................................................................................11
        J. Bush Technologies, Inc.;....................................................................................................11
        K. Bush Viotechnik, GmbH;..................................................................................................11
        L. Bush Beteiligungsgesellschaft GmbH;..............................................................................11
        M. Röhr-Bush Management GmbH;.......................................................................................11
        N. Röhr-Bush GmbH & Co.; and...........................................................................................11
        O. Bush Europe Ltd. ..............................................................................................................11
    B. Financing...............................................................................................................................14
    C. Events Leading to the Debtor's Chapter 11 Filing...............................................................14
    D. Additional Information .........................................................................................................17

IV. OPERATIONS DURING THE REORGANIZATION CASE .............................................17

Case 1-04-12295-CLB, Doc 185, Filed 06/22/04, Entered 06/22/04 17:15:21, Description: Main Document , Page 4 of 61

    A. First Day Relief.................................................................................................17
        1. All of the Debtor's First Day Motions were granted in whole or in part, as
        described below. ..................................................................................................18
        2. Employee Wages and Benefits ........................................................................18
        3. Payment of Pre-Petition Trade Claims and Pre-Petition Issued Checks...........18
        4. Cash Management Motion ................................................................................19
        5. Debtor-in-Possession Financing and Use of Cash Collateral ..........................19
    B. Additional Requests for Relief During Early Stages of Case ...........................22
        1. Retention of Debtor's Counsel.........................................................................22
        2. Employment Contract with FTI and Designation of Michael C. Buenzow as
        Interim CEO ........................................................................................................22
        3. Ordinary Course Professionals Motion.............................................................22
        4. Schedules and Statements of Financial Affairs ...............................................22
        5. Claims Process and Bar Dates .........................................................................22
    C. Appointment of Committees .............................................................................23
        1. Creditors Committee ........................................................................................23
        2. Equity Committee ............................................................................................23
V. THE REORGANIZED DEBTOR ...........................................................................23
    A. Business of the Reorganized Debtor .................................................................23
    B. Liquidity and Capital Resources .......................................................................23
    C. Selected Historical Financial Information..........................................................23
    D. Projected Financial Information.........................................................................24
    E. Management and Board of Directors .................................................................24
        1. The Reorganized Debtor's Board of Directors .................................................24
        2. The Reorganized Debtor's Executive Officers .................................................24
        3. Paul S. Bush's Role with the Debtor and Reorganized Debtor ........................24
VI. THE NEW COMMON STOCK AND POST-REORGANIZATION
INDEBTEDNESS...................................................................................................25
    A. Reorganization Value........................................................................................25
    B. New Common Stock .........................................................................................26
VII. RISK FACTORS .................................................................................................26
    A. Certain Bankruptcy Considerations ..................................................................27
        1. Parties in interest, including HSBC, may object to the Debtor's classifications ..............27
        Section 1122 of the Bankruptcy Code provides that a plan of reorganization may
        place a Claim or an Interest in a particular Class only if such Claim or Interest is
        substantially similar to the other Claims or Interests in such Class. The Debtor
        believes that the classification of Claims and Interests under the Plan complies with
        the requirements set forth in the Bankruptcy Code. HSBC may contest the
        classification of its Claims as Class 3 Claims. However, there can be no assurance
        that the Bankruptcy Court will reach the same conclusion....................................27
        2. The chapter 11 filing may disrupt the Company's operations...........................27
        The impact, if any, that the Reorganization Case may have on the operations of the
        Reorganized Debtor cannot be accurately predicted or quantified. The
        Reorganization Case, particularly if the Plan is not approved or confirmed in the
        time frame currently contemplated, could adversely affect the Debtor's relationship
        with its customers, suppliers and employees. In addition, a prolonged

Reorganization Case could result in, among other things, increased costs for professional fees and similar expenses and may make it more difficult for the Debtor to retain and attract management and other key personnel and would require senior management to spend an excessive amount of time and effort dealing with the Debtor's financial problems instead of focusing on the operation of its business.................27

3. The Debtor may not be able to obtain Confirmation. ......................................27

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity holder of the Debtor might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules..................................................................................27

4. The Debtor may not be able to consummate the Plan. ....................................28

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order and the negotiation and execution of certain documents pertaining to the Revolver, the BNA Term Note, the Rohr Term Note and the LC Rollover Financing Facility. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions will be met (or waived) or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Bankruptcy Court confirms the Plan, there can be no assurance that the Plan will be consummated. If a liquidation or protracted reorganization were to occur, there is a risk that the value of the Debtor's business would be eroded to the detriment of all stakeholders..............................................................................................................28

5. Conditions to the Effective Date may not be satisfied on time........................28

If the conditions to the Effective Date have not been satisfied or waived by August 20, 2004, the DIP Lenders would no longer be bound by the terms and conditions of the Lock Up and Voting Agreement and, therefore, there would be a risk as to the Debtor's ability to successfully reorganize in accordance with the terms of the Plan. .........28

B. Factors Affecting the Value of the New Common Stock....................................28

1. The Reorganized Debtor may not be able to achieve the projected financial results. ................................................................................................................28

The Reorganized Debtor may not be able to meet its projected financial results or achieve the revenue or cash flow that it has assumed in projecting its future business prospects. If the Reorganized Debtor does not achieve these projected revenue or cash flow levels, it may lack sufficient liquidity to continue operating as planned after the Effective Date. The Debtor's Projections represent management's view based on current known facts and hypothetical assumptions about the Reorganized Debtor's future operations. The Projections do not guarantee the Reorganized Debtor's future financial performance................................................................................28

2. The Reorganization Case may increase the tax liability of the Reorganized Debtor ................................................................................................................29

The U.S. federal income tax consequences of consummation of the Plan to holders of Claims or Interests are complex and subject to uncertainty. Certain tax attributes of the Debtor, including net operating loss carryovers, may be reduced or eliminated as a consequence of the Plan. The elimination or reduction of net operating loss carryovers and such other tax attributes may increase the amount of tax payable by

the Reorganized Debtor following the consummation of the Plan as compared with the amount of tax payable had no such reduction been required. See Article XI, "Certain U.S. Federal Income Tax Consequences"...........................................................29

   3. Additional Factors Previously Disclosed...........................................................29

C. Projections, Business Plan and Reorganization Value.........................................30

VIII. GENERAL INFORMATION CONCERNING THE PLAN.......................................30

A. Releases.........................................................................................................30

   1. General Releases by Holders of Claims or Interests.......................................30

   2. General Releases by the Debtor.....................................................................31

B. Exculpation/Limitation of Liability.....................................................................32

C. Injunction Related to Releases/Exculpation.........................................................33

D. Discharge of Claims and Termination of Interests; Related Injunction..............33

E. Preservation of Rights of Action by the Debtor and the Reorganized Debtor...................34

F. Cancellation and Surrender of Instruments, Securities and Other Documentation.............35

G. Release of Liens...............................................................................................35

H. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes...............................................................................................................35

I. Executory Contracts and Unexpired Leases.........................................................36

IX. DISTRIBUTIONS UNDER THE PLAN ...............................................................37

A. General............................................................................................................37

B. Methods of Distributions...................................................................................38

   1. Delivery of Distributions in General..............................................................38

C. Undeliverable or Unclaimed Distributions...........................................................38

D. Transfers after Confirmation Date.....................................................................38

E. Setoffs.............................................................................................................39

F. Disputed Claims................................................................................................39

G. Objections to Claims or Interests and Authority to Prosecute Objections.............39

H. Dissolution of Committees................................................................................40

X. VOTING AND CONFIRMATION PROCEDURE ...................................................40

A. General............................................................................................................40

B. Voting Procedures and Requirements for Voting ................................................41

C. Confirmation Hearing .......................................................................................41

D. Confirmation ...................................................................................................42

E. Acceptance and Cramdown...............................................................................42

F. Modification or Revocation of the Plan...............................................................43

G. Best Interests Test; Liquidation Analysis ...........................................................44

H. Feasibility........................................................................................................45

I. Compliance with Applicable Provisions of the Bankruptcy Code .........................46

J. Alternatives to Confirmation and Consummation of the Plan ...............................46

XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ...............................46

A. General............................................................................................................46

B. Federal Income Tax Consequences to the Debtor................................................47

   1. Discharge of Indebtedness Income and Reduction of Tax Attributes .............48

   2. Limitation on NOL Carryovers and Certain Built-in Losses and Credits Following Ownership Change ........................................................................48

C. Certain Federal Income Tax Consequences to Holders of Claims........................49

Case 1-04-12295-CLB,   Doc 185,   Filed 06/22/04,   Entered 06/22/04 17:15:21,
Description: Main Document , Page 7 of 61

    1. Recognition of Gain or Loss ................................................................49

    2. Distributions in Discharge of Accrued but Unpaid Interest............................50

    3. Character of Gain or Loss; Tax Basis; Holding Period ................................50

  D. Information Reporting and Backup Withholding ................................................50

XII.  APPLICABILITY OF CERTAIN U.S. FEDERAL AND STATE SECURITIES

LAWS ................................................................................................................51

XIII.  ADDITIONAL INFORMATION ................................................................51

XIV.  CONCLUSION ................................................................................................52

Case 1-04-12295-CLB,   Doc 185,   Filed 06/22/04,   Entered 06/22/04 17:15:21,
Description: Main Document , Page 8 of 61

**TABLE OF EXHIBITS**

**EXHIBIT A:**       **LOCK UP AND VOTING AGREEMENT**

**EXHIBIT B-1:**     **2001 AND 2002 CONSOLIDATED FINANCIAL STATEMENTS**

**EXHIBIT B-2:**     **2003 CONSOLIDATED FINANCIAL STATEMENTS**

**EXHIBIT C-1:**     **CONSOLIDATED PROJECTIONS THROUGH 2009**

**EXHIBIT C-2:**     **PROJECTIONS FOR BUSH TECHNOLOGIES (THE COLOR WORKS, INC.) AND ROHR THROUGH 2009**

**EXHIBIT D:**       **LIQUIDATION ANALYSIS**

Case 1-04-12295-CLB,    Doc 185,    Filed 06/22/04,    Entered 06/22/04 17:15:21,
Description: Main Document  , Page 9 of 61

## I.    EXECUTIVE SUMMARY

The Debtor is seeking approval of the Plan.  This Disclosure Statement is submitted by the Debtor in connection with the solicitation of acceptances of the Plan. The primary objectives of the Plan are to:

- restructure the Debtor's debt and capital structure to permit it to emerge from this Reorganization Case with a viable debt and capital structure;

- maximize the value of the ultimate recoveries to all creditors on a fair and equitable basis; and

- settle, compromise or otherwise dispose of certain Claims and Interests on terms that the Debtor believes to be fair and reasonable and in the best interests of its Estate and stakeholders.

The Plan provides for, among other things:

- full payment, in Cash, of all Allowed Priority Claims;

- full payment, in Cash, of all Allowed Unsecured Claims (together with a waiver of preference claims, if any);

- Reinstatement of all Allowed Secured Claims, other than the Prepetition Credit Facility Claims;

- cancellation of any and all equity securities in the Debtor including all Old Common Stock and any other Interests;

- satisfaction of the Claims of the lenders under the Prepetition Credit Facility by distribution to the Administrative Agent on behalf of the holders of Class 3 Claims of the BNA Term Note, the Rohr Term Note and the New Common Stock;

- assumption of the LC Rollover Financing Facility;

- restructuring of the indebtedness owing under the DIP Facility through the Revolver;

- the assumption or rejection of Executory Contracts and Unexpired Leases;

By Order of the Bankruptcy Court, dated June __, 2004, this Disclosure Statement has been approved as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

Case 1-04-12295-CLB,    Doc 185,    Filed 06/22/04,    Entered 06/22/04 17:15:21, Description: Main Document  , Page 10 of 61

## II.    OVERVIEW OF THE PLAN

### A.    General Information Concerning Treatment of Claims and Interests

The Plan provides that holders of Allowed Priority Claims and Allowed Unsecured Claims will be paid in cash in full.  The Plan also provides for the Reinstatement of all Allowed Secured Claims other than the Prepetition Credit Facility Claims.

The Plan provides that the Prepetition Credit Facility Claims will be canceled and such Claims will be satisfied by distribution to the holders of Class 3 Claims, on a Pro Rata Basis, of all the issued and outstanding New Common Stock and by the distribution to the Administrative Agent of the BNA Term Note and the Rohr Term Note.  The indebtedness, if any, which remains owing under the DIP Facility will be restructured through the Revolver.

Under the Plan, all outstanding shares of Old Common Stock of the Debtor and all Interests and Claims associated therewith will be canceled.  The holders of such Interests and Claims will retain no property and receive no distributions under the Plan.

### B.    Cramdown of Class 5 Interests and Class 6 Subordinated Claims

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a plan of reorganization in certain circumstances, even if the plan is not accepted by all impaired Classes of Claims and Interests of the Debtor.  See "Voting and Confirmation of the Plan — Acceptance or Cramdown."  The Debtor intends to seek "cramdown" of the Plan with respect to Class 5 and Class 6 as the holders of Interests and Claims in Class 5 and Class 6, respectively, will not receive or retain any property under the Plan.

### C.    Effective Date

Under the Plan, the Effective Date will occur on a day, to be determined by the Debtor and the Requisite DIP Lenders as soon as reasonably practicable after all conditions to the Effective Date set forth in Plan have been met or waived pursuant to the Plan.  For purposes of this Disclosure Statement, the Effective Date is assumed to occur on July 31, 2004.  There can be no assurance, however, as to when or if the Effective Date will actually occur.

### D.    Summary of Classes and Treatment of Claims and Interests

The classification of Claims and Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims and Interests in each Class are summarized in the table below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and DIP Facility Claims have not been classified.  In addition, Intercompany Claims have not been classified.  See "Treatment of Administrative Claims, Priority Tax Claims, DIP Facility Claims and Intercompany Claims."

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| **Class 1 (Non Prepetition Credit Facility Secured Claims – Not Impaired)**<br><br>This Class consists of all Allowed Secured Claims, including rights of offset, other than Prepetition Credit Facility Claims.<br><br>Estimated Aggregate Amount of Class 1 Claims as of the Effective Date: $6,854,000 | On the Effective Date, each Allowed Class 1 Claim will be Reinstated.  Class 1 is not impaired and, therefore, is deemed to have accepted the Plan.<br><br><br><br>Percentage Recovery:  100% |
| **Class 2 (Non Tax Priority Claims – Not Impaired)**<br><br>This Class consists of all Allowed Priority Claims against the Debtor, other than Priority Tax Claims, which shall not have been paid prior to the Effective Date pursuant to Bankruptcy Court order.<br><br>Estimated Aggregate Amount of Class 2 Claims as of the Effective Date: $3,350,000 | On the Effective Date, each Allowed Class 2 Claim will be paid in full, in Cash.  Class 2 is not impaired and, therefore, is deemed to have accepted the Plan.<br><br><br><br>Percentage Recovery:  100% |
| **Class 3 (Prepetition Credit Facility Claims – Impaired)**<br><br>This Class consists of all Prepetition Credit Facility Claims, including the unsecured portion of such Claims.<br><br>Estimated Aggregate amount of Class 3 Claims as of the Effective Date: $158,000,000 | On the Effective Date, the Reorganized Debtor will deliver to the Administrative Agent on behalf of all holders of Allowed Class 3 Claims, the BNA Term Note, the Rohr Term Note and the New Common Stock, in full satisfaction of all Allowed Class 3 Claims.  All Class 3 Claims shall be deemed Allowed Claims.  Class 3 is impaired and will be entitled to vote on the Plan.<br><br><br>Estimated percentage recovery: 59% |

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| Class 4 (Unsecured Claims – Not Impaired)<br><br>This Class consists of all Allowed Unsecured Claims, including those arising from the sale of goods and services and from the rejection of Executory Contracts and Unexpired Leases, which shall not have been paid prior to the Effective Date pursuant to Bankruptcy Court order.<br><br>Estimated Aggregate amount of Class 4 Claims as of the Effective Date: $11,339,000 | On the Effective Date, each Allowed Class 4 Claim will be paid in full, in Cash.<br><br>Pursuant to Article IV of the Plan, the Debtor shall be deemed to have released all preference claims against holders of Allowed Class 4 Claims.<br><br>Class 4 is not impaired and, therefore, is deemed to have accepted the Plan.<br><br>Percentage recovery:  100% |
| Class 5 (Interests – Impaired)<br><br>This Class consists of all Interests in the Debtor<br><br>Aggregate outstanding number of shares of Old Common Stock:<br>Class A – 10,385,242;<br>Class B -   3,395,365. | On the Effective Date all Interests will be deemed cancelled and nullified in all respects and with no further action on the part of the Debtor, the Reorganized Debtor or any other party.  No property will be distributed to or retained by the holders of Allowed Interests in Class 5 on account of such Interests and, therefore, Class 5 is deemed to have rejected the Plan.  Accordingly, as set forth in Article IX of the Plan, the Debtor will request Confirmation under section 1129(b) of the Bankruptcy Code with respect to Class 5.<br><br>Percentage recovery:  0% |

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| Class 6 (Subordinated Claims – Impaired)<br><br>This Class consists of any Claim arising from rescission of a purchase or sale of a security of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim that is determined to be subordinated to other Claims pursuant to section 510(b) of the Bankruptcy Code or any other Claim subject to subordination pursuant to section 510 of the Bankruptcy Code.<br><br>Estimated Aggregate Amount of Class 6 Claims as of the Effective Date: $0 | No property will be distributed to or retained by the holders of Subordinated Claims in Class 6 on account of such Claims.  As set forth in Article IX, the Debtor requests confirmation under section 1129(b) of the Bankruptcy Code with respect to Class 6.<br><br>Percentage recovery:  0% |

### E.      Funding of Plan, Exit Financing

The Cash distributions provided for under the Plan contemplate and require the availability of the Revolver from the Revolver Participating Lenders.  These Participating Lenders are anticipated to consist of all or a portion of the holders of the Class 3 Claims. The terms of the Revolver are described in Exhibit A to the Plan.  Exhibit B to the Plan describes the terms of the BNA Term Note, the Rohr Term Note and the LC Rollover Financing Facility.  On the Effective Date, the Reorganized Debtor shall be authorized to execute and deliver those documents necessary or appropriate to obtain the Revolver, to assume the LC Rollover Financing Facility and to issue the BNA Term Note and the Rohr Term Note, including without limitation, security agreements, financing statements, notes, credit agreements, mortgages and deeds of trust.  All Cash necessary for the Reorganized Debtor to make payments pursuant to the Plan will be obtained from the Debtor's cash balances, cash generated from operations and the Revolver.

### F.      Sources and Uses of Cash

The following table sets forth a summary of the principal sources and uses of Cash expected to be available to the Reorganized Debtor on the Effective Date assuming that the closing of the Revolver occurs on the terms and conditions described in Exhibit A to the Plan. All amounts shown are estimates. There can be no assurance that there will not be material variances between such estimates and the actual amounts of Cash required to consummate the Plan.

**Sources**

     Cash Generated from Operations                                                     $      13,667

| | | |
|---|---|---|
| Proceeds from revolving credit facility | | 13,676 |
| Total Sources | $ | 27,343 |

**Uses of Cash**

| | | |
|---|---|---|
| Class 1 (Non Prepetition Credit Facility Secured Claims)1 | $ | 6,854 |
| Class 2 (Non-Tax Priority Claims)2 | | 3,350 |
| Class 3 (Unsecured Claims)3 | | 11,339 |
| Administrative claims | | 5,800 |
| Cash | | - |
| Total Uses | $ | 27,343 |

(1) Right of Set-off relating to Pre-petition Customer Advertising and Promotional Expenses. Does not incl
Pennsylvania loans.
(2) Preliminary estimate of employee related liabilities. Priority portion undetermined.
(3) Potential rejection of executory contract or unexpired leases are not included.

### G. Treatment of Administrative Claims, Priority Tax Claims, DIP Facility Claims and Intercompany Claims

#### 1. Administrative Claims

Except as specified in the Plan, and subject to the Bar Date provisions in the Plan, unless otherwise agreed by the holder of an Administrative Claim and the Reorganized Debtor, each holder of an Allowed Administrative Claim will receive, in full satisfaction of such Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim either: (a) on the Effective Date; or (b) if the Administrative Claim is not Allowed as of the Effective Date, within 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is approved by the Bankruptcy Court, provided, however, that for any Stipulation of Amount and Nature of Claim that is entered into by the Debtor or Reorganized Debtor, as applicable, and a Claim holder which provides for the allowed amount of the applicable Claim to be less than $50,000, such Stipulation of Amount and Nature of Claim shall be deemed approved by the Bankruptcy Court without further order of the Bankruptcy Court. Administrative Claims include Claims for costs and expenses of administration allowed under section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:

- the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises);

- compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under section 330(a), 331, 503(b) or 1103 of the Bankruptcy Code, including Fee Claims;

Case 1-04-12295-CLB, Doc 185, Filed 06/22/04, Entered 06/22/04 17:15:21,
Description: Main Document , Page 15 of 61

- all fees and charges assessed against the Debtor's Estate under 28 U.S.C. §1930;

- Claims for reclamation allowed in accordance with section 546(c)(2) of the Bankruptcy Code and section 2-702 of the Uniform Commercial Code, if any; and

In addition to the types of Administrative Claims described above, section 503(b) of the Bankruptcy Code provides for payment of compensation or reimbursement of expenses to creditors and other entities making a "substantial contribution" to a chapter 11 case and their attorneys and other professional advisors. The amounts, if any, that such entities will seek or may seek for such compensation or reimbursement are not known by the Debtor at this time. Requests for such compensation or reimbursement must be approved by the Bankruptcy Court after notice and a hearing at which the Debtor and other parties in interest may participate and, if appropriate, object to the allowance of any such compensation or reimbursement.

Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash as and when due. Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business (including Postpetition claims of trade creditors incurred in the Debtor's ordinary course of business, Governmental Unit Claims for taxes and Administrative Claims arising under contracts and leases) will be paid by the Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims.

Except as otherwise provided in the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtor and the Reorganized Debtor or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtor and the requesting party by the later of (a) 30 days after the Effective Date or (b) 60 days after the Filing of the applicable request for payment of Administrative Claims.

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtor and such other entities as may be designated by the Bankruptcy Rules, the Confirmation Order, or any other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to an order entered by the Bankruptcy Court authorizing the Debtor to employ and retain professionals in the ordinary course of business may continue to receive such compensation and

reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to such order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtor and the requesting party within 30 days after the Filing of the applicable request for payment of the Fee Claim.

The following holders will not be required to File or serve any request for payment of such Administrative Claims: (a) holders of Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business, including Claims for goods or services, Governmental Unit Claims for taxes and Administrative Claims arising under contracts and leases; and (b) holders of DIP Facility Claims.

The Debtor estimates that the Administrative Claims will aggregate approximately $5.8 million as of the Effective Date, excluding post-petition accounts payable, Fee Claims and other accrued liabilities.

## 2. Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Allowed Priority Tax Claim, payment in full, in Cash either (a) on the Effective Date or (b) in deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim. Deferred payments will be made in equal annual installments of principal, plus simple interest accruing from the Effective Date at the Priority Tax Interest Rate per annum on the unpaid portion of each Allowed Priority Tax Claim (or upon such other terms determined by the Bankruptcy Court to provide the holders of Priority Tax Claims with deferred Cash payments having a value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claims).

Notwithstanding the foregoing, a holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with, the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will not be Allowed in connection with the Reorganization Case and will not be entitled to any treatment or distributions. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

## 3. DIP Facility Claims

Unless otherwise agreed by the DIP Lenders, on the Effective Date, all DIP Facility Claims will be either: (i) paid in Cash equal to the amount of such allowed DIP Facility Claims, without any further action by the holders of such allowed DIP Facility Claims, or (ii) upon the agreement of the holders of such Claims, refinanced in connection with the establishment of the Revolver. In addition, the actual, reasonable fees and expenses of the professionals retained by the DIP Lenders (in such capacity and any other capacity) in connection with the Prepetition Credit Facility, the DIP Facility, the BNA Term Note, the Rohr Note, the LC Rollover Financing Facility, the Revolver

and the Reorganization Case in general, including the Participating Lender Professionals, will be paid in full in Cash without a corresponding reduction of any DIP Facility Claims or Prepetition Credit Facility Claims held by the DIP Lenders. All DIP Facility Claims shall be deemed Allowed Claims.

### 4. Intercompany Claims

Intercompany Claims will be reinstated, contributed, extinguished and/or discharged in each case in order to maximize the tax attributes thereof as determined by the Reorganized Debtor. In no event shall any distributions be made under the Plan on account of Intercompany Claims.

### H. Securities To Be Issued Under the Plan

The Plan provides that, as of the Effective Date, the Reorganized Debtor will be authorized to issue 5,000,000 shares of New Common Stock, par value $.01 per share. On the Effective Date, pursuant to the Plan, 1,000,000 shares of New Common Stock, the BNA Term Note, and the Rohr Term Note will be issued, on a Pro Rata Basis, to the holders of Allowed Class 3 Claims and will be delivered to the Administrative Agent for distribution among such holders.

### I. Conditions to Confirmation and the Effective Date of the Plan

There are several conditions precedent to Confirmation and the occurrence of the Effective Date, which are discussed below.

### 1. Conditions to Confirmation

The Bankruptcy Court will not enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived:

- Each of the LC Rollover Financing Facility and the Revolver Commitment shall continue to be in full force and effect.

- Each of the Final Cash Collateral Order and the Final DIP Order remain Final Orders.

- The Confirmation Order shall be in form and substance acceptable to the Requisite DIP Lenders and the Debtor.

### 2. Conditions to the Effective Date

The Effective Date will not occur unless and until the following conditions have been satisfied or, if applicable, duly waived by the Debtor and the Requisite DIP Lenders:

- The Confirmation Order shall have been entered by the Bankruptcy Court.

- The documents effectuating the BNA Term Note, the Rohr Term Note and the Revolver shall have been executed and delivered and all conditions to funding of the Revolver have been satisfied or waived.

- The Debtor shall have sufficient Cash to make the distributions required under the Plan.

- The Effective Date shall occur by August 20, 2004.

### 3. Waiver of Conditions to Confirmation or Effective Date

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or part by the Debtor with the consent of the Requisite DIP Lenders at any time without an order of the Bankruptcy Court.

### 4. Effect of Nonoccurrence of Conditions to Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived, then upon motion by the Debtor (made with the consent of the Requisite DIP Lenders) made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Article VIII of the Plan:

- the Plan will be null and void in all respects, including with respect to: (a) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code; and (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases; and

- nothing contained in the Plan will (a) constitute a waiver or release of any claims by or against, or any Interest in, the Debtor; or (b) prejudice in any manner the rights of the Debtor or any other party in interest.

## III. BACKGROUND OF DEBTOR AND EVENTS LEADING TO CHAPTER 11

### A. BACKGROUND

The Debtor is a diversified global furniture manufacturer and supplier of surface technologies. Headquartered in Jamestown, New York, the Debtor is the successor entity to Bush Brothers Product Corporation ("Bush Brothers"), which was founded in 1959 and operated as a closely held business until the mid-1980s, when its stock became publicly held and traded on the American Stock Exchange. Thereafter, from July 14,

1994 until trading was suspended in March 2004, the stock was traded on the New York Stock Exchange under the stock symbol "BSH".

The Debtor is (directly or indirectly) the parent company of several wholly owned Subsidiaries including:

A.  Bush Industries of Pennsylvania, Inc.;

B.  Bush Industries of Ohio, Inc.;

C.  Bush Management, Inc.;

D.  Bush Service Group, Inc.;

E.  Bush Industries, DE Mexico, SA, DE, C.V.;

F.  Bush Commercial DE, SA, DE, C.V.;

G.  The Color Works, Inc.;

H.  Fournier, Inc.;

I.  Hydro Grafix, Inc.;

J.  Bush Technologies, Inc.;

K.  Bush Viotechnik, GmbH;

L.  Bush Beteiligungsgesellschaft GmbH;

M.  Röhr-Bush Management GmbH;

N.  Röhr-Bush GmbH & Co.; and

O.  Bush Europe Ltd.

Although each of the Subsidiaries is a separate legal entity, the Debtor has used the Prepetition Credit Facility from time to time to fund the operations of certain of the Subsidiaries using a central cash management system.

The Debtor and its Subsidiaries operate in three business segments[1] composed of (i) Bush Furniture North America, which concentrates on the design, manufacture and sale of furniture in the commercial and consumer markets; (ii) Bush Furniture Europe, which sells commercial, home office and other furnishings in the European market and (iii) Bush Technologies which focuses on aftermarket accessories for cell phones, as well as the utilization of surface technologies for automobile interiors, cosmetics, sporting goods and consumer electronics.

---

1 The Debtor previously reported that it operated in four business segments.  However, as a result of certain consolidations and non-bankruptcy restructuring efforts described in more detail in this Disclosure Statement, since Q1 2003, the Debtor has consolidated the Bush Furniture and Bush Business Furniture segments into Bush Furniture North America.

Case 1-04-12295-CLB,   Doc 185,   Filed 06/22/04,   Entered 06/22/04 17:15:21,
Description: Main Document  , Page 20 of 61

The Debtor and Subsidiaries conduct their operations from owned and leased facilities located in the United States, Germany and Mexico. The Debtor, which is primarily engaged in the "ready to assemble" ("RTA") furniture business, owns four (4) facilities located in Upstate New York. Three of the Debtor's facilities, including its headquarters, are located in the Jamestown, New York area. These facilities are "mixed use" - manufacturing/warehousing/office properties. The Debtor's remaining manufacturing facility is located in Little Valley, New York.

In its earliest stages, the Bush Brothers product line consisted of a chrome-plated tubular "Port-a-Rack" (a bathroom drying rack) and a line of chrome-plated wall accessories (towel bars, rings, etc.). The product line was later expanded to include plastics, with the first plastic parts being tooled and developed in 1971. Product innovation became a priority, resulting in the development of the first practical customer-assembled hamper, as well as other bathroom cabinets.

The late-1970's saw expansion of Bush Brothers wood-working capability and a gradual shift from housewares products to electronics products that the end customers would assemble themselves. The beginning of the Debtor's current product line was a wood-finished plastic TV pedestal table, introduced in 1972. When the Debtor entered the electronics furniture market, ready-to-assemble ("RTA") was then known as "K-D" (knock-down) furniture, and was generally of poor quality and design. The Debtor's emphasis on innovative design led to several market breakthroughs with the introduction of new products in the electronics furniture industry. As purchases of stereo systems, microwave ovens, VCRs, and personal computers rose, the Debtor's sales increased dramatically.

The Debtor's first computer furniture line - the Home Base Series - was introduced in 1983 and incorporated "vertical storage" into its design. The Debtor was the first to introduce hardwood products to the RTA market which became a key element in the growth of the Debtor's business. In the 1990's, the Debtor broadened its product scope and made several acquisitions to expand its furniture-making capacity. Rapid growth was fueled by the Debtor's relationships with numerous "big box" retailers who expanded quickly to build national penetration.

As part of the Debtor's growth strategy and commitment to innovation, it made acquisitions in the mid-to-late 1990's to diversify its business. In May 1996, the Debtor acquired a two-thirds equity interest in The Color Works, Inc. ("Colorworks") and purchased the remaining balance in September of the same year. Based in Greensboro, North Carolina, Colorworks holds the master license for the patented "HydroGraFix" film processing technology in the Western Hemisphere, portions of Central Europe and South Africa. Initially developed in Japan, HydroGraFix is a finishing and decorating process that prints on complex three-dimensional parts and various surfaces. Since that acquisition, the scope of Colorworks' processing and finishing technologies has expanded. Cell phones, laptop computers, automotive interior components, cosmetics,

and sporting goods such as firearms and archery equipment are examples of major product lines decorated by Colorworks (now known as the division, Bush Technologies[2]). In fiscal year 2002, Bush Technologies contributed approximately 6.3% and 8.6% of the Debtor's consolidated total net sales and total assets, respectively.

In March 1997, the Debtor acquired 51% of Röhr Gruppe, Inc., which name was subsequently changed to Röhr-Bush GmbH & Co. ("Röhr"), a furniture manufacturer located in Germany. In October 2000, the Debtor acquired the remaining 49% minority interest. Röhr's product line of RTA and partially assembled furniture at popular price points is similar to the Debtor's, with an emphasis on youth bedroom, living room, and office. In fiscal 2002, Röhr (Bush Furniture Europe) contributed 14.9% and 18.7% of the Debtor's consolidated total net sales and total assets, respectively.

In the furniture segment, the Debtor and certain of its Subsidiaries are engaged in the design, manufacture and sale of RTA and assembled furniture products in various price ranges for both business and consumer use. These products include commercial office, home office, home entertainment and bedroom furniture. Products within these various category types include desks, computer stands, conference tables, television stands, audio stands, home entertainment centers and bedroom furniture including bed frames, dressers and the like. The Debtor's furniture line is offered under the following brand names: Bush Furniture, Eric Morgan and Röhr. Though the Debtor produces a broad set of furniture categories, its position is clearly strongest in office and home entertainment furniture, the largest major product categories in the RTA furniture industry.

RTA furniture is furniture for home or business use that is typically: (1) packed flat in pieces for ease of shipping and stocking, allowing retailers to maintain inventory for immediate customer pick-up; and (2) designed for ease of assembly, to ensure end users can readily assemble and install the furniture item by following easy-to-read diagramed instructions. RTA is usually constructed from particleboard or medium-density fiberboard ("MDF") pieces laminated with paper bearing a variety of simulated wood or colored finishes (RTA may also feature glass shelves and metal hardware). Savings in materials, shipping, delivery, and assembly result in significantly lower prices for RTA versus solid wood assembled furniture. The values and increasing quality in RTA fueled the category's popularity and growth and its physical characteristics encouraged many non-furniture retailers to enter the market segment.

The product range of the Debtor's (and certain of its Subsidiaries') RTA furniture business has expanded and evolved over time as the Debtor built on strong product positions and/or developed innovative new products to fit emerging consumer technology and lifestyle trends. The Debtor's RTA products currently include TV/VCR stands and carts, home entertainment centers, audio racks, home theater furniture, wall units, bookcases, computer desks and workstations, hutches, armoires, executive desks,

---

2 Not to be confused with Bush Technologies, Inc.

credenzas, file cabinets, printer carts, bedroom furniture, and utility furniture. In addition, the Debtor recently introduced (and is expanding) lines of assembled furniture (also referred to as "case goods") for both the home and business markets. Home-related case goods are marketed under the brand name Eric Morgan and include entertainment walls, youth bedroom, adult bedroom, storage, and home office. In addition, the Debtor has introduced commercial-grade assembled office furniture under the brand name Röhr in the North American market. Both the commercial office and home-related product launches have leveraged designs or styles from Bush Furniture Europe. In addition, the Debtor's product range has been further expanded by the Q1 2003 launch of internal importing capabilities to source complete products from Asian suppliers (parts, such as metal hardware and glass shelving, have been sourced via imports for several years). This import capability enables the Debtor to tap cheaper sources for Bush-designed products made of solid woods/wood veneers or entirely of metal and glass.

The Debtor's furniture products are marketed to a variety of retailers and distributors for both business and consumer end-users. The Debtor's customers include electronic superstores, office superstores, office furniture retailers and home furnishing stores. The Debtor's furniture products are sold both through independent manufacturers' representatives and directly by the Debtor's sales personnel. The Debtor's furniture products (excluding those products sold by Röhr) are currently sold to approximately 300 customers and are carried in an estimated 8,400 retail outlets.

## B.    Financing

Prior to the Petition Date, the Debtor's operations (and those of its Subsidiaries) were primarily financed through a revolving credit facility established by loan agreements dated as of June 26, 1997 ("Prepetition Credit Facility") and offered through a syndicate of lenders lead by JPMorgan Chase Bank (collectively, the "Prepetition Credit Facility Lenders"). The Prepetition Credit Facility provided revolving credit loans, swing line loans and multi-currency loans in the approximate aggregate amount of $173,000,000. The Prepetition Credit Facility is secured by substantially all of the Debtor's assets, and is further guaranteed by the Debtor's domestic Subsidiaries.

Since its origination, the Prepetition Credit Facility has been amended nine times. For the reasons discussed below, the seventh amendment, dated as of February 28, 2003 (i) prohibited, and continues to prohibit, the Debtor from paying cash dividends, (ii) reduced the borrowing limit from $173,000,000 to $163,000,000, (iii) provided the Prepetition Credit Facility Lenders with additional security, and (iv) established additional affirmative and negative covenants, including, without limitation, "benchmarks" relating to net worth and earnings before interest, taxes, depreciation and amortization ("EBITDA"). The Prepetition Credit Facility was subsequently amended by the eighth and ninth amendments dated as of November 7, 2003 and March 1, 2004, respectively, to provide for the waiver of certain covenant defaults, which waivers expired on April 1, 2004. Absent events of default thereunder, the Prepetition Credit Facility is fully due and payable in accordance with its terms on June 30, 2004.

## C.    Events Leading to the Debtor's Chapter 11 Filing

The RTA industry has faced difficult conditions amid the general economic downturn of the past few years. In recent years, the Debtor has experienced several challenges across its business lines, especially in its RTA furniture business. Among these challenges are (i) increased competition from imports, particularly from China and the Far East, which have increased the foreign competitors' market share in the RTA furniture industry from 6% to 15% in recent years, (ii) a decrease in product demand and overall sales, (iii) fluctuations in currency exchange rates (i.e. the weakening of the U.S. dollar) which increased the U.S. dollar equivalent of Euro denominated debt held by the Debtor's German Subsidiary, (iv) an increase in expenses and (v) difficulty in securing reliable sources of raw materials and supplies. Additional factors which affect the Debtor's operations and profitability include general economic conditions, consumer confidence, product design, price competition and technology, as well as profitability and continued liability of customer relationships.

### a.    Restructuring Efforts

In response to the above-referenced challenges and in an effort to improve its financial performance, the Debtor undertook a non-bankruptcy restructuring plan which was approved by its Board of Directors in early February 2003. As a part of this effort, the Debtor and its Subsidiaries closed the St. Paul, Virginia manufacturing facility (which remains available for sale) and relocated certain operations to other plants, closed three retail outlet stores and attempted to expedite the sale of excess inventory (with the intent of creating space in a Subsidiary's Erie, Pennsylvania facility to launch new production strategies), and terminated production and management level employees in various locations. The restructuring plan also included Bush Technologies, where the unprofitable accessory product line for mobile phones was eliminated and Bush Europe where unprofitable product lines were phased out and headcount reduced.

In addition to the operational losses leading up to the Reorganization Case, the Debtor has also experienced "paper losses" in recent years due to an accounting change affecting goodwill. As of December 30, 2001 (for the 2002 fiscal year), the Debtor adopted Statement of Financial Accounting Standards No. 142 ("SFAS No. 142") relating to goodwill and other intangible assets. SFAS No. 142 addresses the financial accounting and reporting for acquired goodwill and other intangible assets with indefinite lives. Pursuant to SFAS No. 142, goodwill is no longer amortized and must be periodically tested for impairment. As a result, the Debtor concluded that goodwill related to the Bush Furniture Europe segment was impaired, and accordingly recorded a non-cash charge for goodwill impairment of $2,398,000. More recently, the Debtor conducted a good will impairment assessment in the Q4 2003. Pursuant to that assessment, the Debtor's management evaluated the fair value of Bush Furniture North America and Bush Technologies using a discounted future cash flow methodology. The Debtor concluded that under SFAS No. 142, the entire net carrying amount of goodwill of each business segment was impaired and consequently a one time chargeable loss was taken in the 2003 consolidated statement of operations totaling $13,002,000. During the 2003 fiscal year, the Debtor also incurred a pretax restructuring charge of $21,779,000 with respect to the aforementioned restructuring plan. This restructuring charge included a charge of $9,677,000 associated with inventory write downs and a $12,102,000 for non-

Case 1-04-12295-CLB,    Doc 185,    Filed 06/22/04,    Entered 06/22/04 17:15:21,
Description: Main Document , Page 24 of 61

inventory write downs. Additional liabilities incurred in the year ended January 3, 2004 totaling $7,056,000, consist primarily of severance costs, contract and lease termination costs and other expenses. In the 2003 fiscal year, the Debtor paid $5,372,000 with respect to the aforementioned costs, resulting in a remaining liability of $1,684,000. Moreover, the Debtor incurred significant professional fee expenses, as well as a $3,815,000 (non-cash) write down of a non-operating investment.

Having realized the challenges it was facing, including the June 30, 2004 deadline for repayment of the Prepetition Credit Facility, the Debtor retained FTI Consulting, Inc. ("FTI") in July 2003. A national and well-established crisis management and restructuring consulting firm, FTI's mission was to analyze opportunities for the refinancing of the Debtor's operations, and to work with the Prepetition Credit Facility Lenders. The FTI team assigned to the Debtor immediately realized that the Debtor's ability to refinance its debt would be dependant upon improved operating results, financial performance and related liquidity measures.

The Debtor also hired National City Bank in July 2003 to raise $30-$50 million of mezzanine financing. Although the Debtor received an indication of interest from a lender, the Debtor was not able to successfully negotiate certain provisions of the loan(s). As a result of its unsuccessful mezzanine financing efforts, the Debtor's Board of Directors considered a sale of the Debtor and its Subsidiaries in October 2003. However, the Debtor's and its Subsidiaries' EBITDA levels indicated that the sale price would not satisfy the outstanding obligations.

In conjunction with the "domestic" refinancing effort, Ernst & Young was retained to investigate the possibility of selling or refinancing the Debtor's German Subsidiary, Rohr. In September 2003, the Debtor received an initial letter of interest concerning the purchase of Rohr. However, ensuing conversations did not lead to material negotiations and the proposal did not lead to definitive documentation. Although additional efforts continued throughout the period to reduce costs and improve cash flows through the implementation of cost cutting measures and management changes at the Debtor and its Subsidiaries, the Debtor was unable to obtain replacement financing.

Concerned with the Debtor's financial performance, the Prepetition Credit Facility Lenders met with representatives of the Debtor in August 2003. The Debtor's deteriorating financial performance resulted in certain covenant defaults under the Prepetition Credit Facility in the third quarter of 2003. In connection with these defaults, the Debtor obtained waivers pursuant to the Eighth and Ninth Amendments to the Prepetition Credit Facility. Despite the changes in the Prepetition Credit Facility pursuant to the Eighth and Ninth Amendments, the Debtor continued to be unable to meet specified financial milestones. In February 2004, the Debtor requested an eighteen (18) month extension of the Prepetition Credit Facility, predicated on a proposal involving major asset sales, additional cost reductions and certain management changes. That request was denied.

### b. Chapter 11 Filing

Following protracted negotiations with the Prepetition Credit Facility Lenders, and the consideration of numerous alternatives, both the Debtor and the Prepetition Credit Facility Lenders exclusive of HSBC Bank USA ("HSBC") determined that their respective interests, as well as those of other creditors and employees, would best be served by the restructuring set forth in the Plan through the vehicle of a chapter 11 filing. The Plan was pre-negotiated by the Debtor, with the assistance of FTI and counsel, and the Prepetition Credit Facility Lenders exclusive of HSBC. Prior to the Petition Date, the Debtor and the Prepetition Credit Facility Lenders exclusive of HSBC executed the Lock Up and Voting Agreement dated as of March 29, 2004 (the "Lock Up and Voting Agreement"). A copy of the Lock Up and Voting Agreement is attached hereto as Exhibit A. HSBC is not a party to the Lock Up and Voting Agreement. The Debtor filed its chapter 11 petition on March 31, 2004.

### D.    Additional Information

Further information regarding the business and properties of, and other matters relating to the Debtor's financial condition as of the Petition Date can be found in the Debtor's Schedules. Consolidated financial statements for the Debtor and its Subsidiaries for (i) the years 2001 and 2002, and (ii) for the year 2003, are attached as Exhibit B-1 and Exhibit B-2, respectively, to this Disclosure Statement. Further information regarding the business operations and financial affairs of the Debtor and its Subsidiaries can be found in its securities filings, which can be viewed through the Debtor's web site at www.bushindustries.com.

## IV.    OPERATIONS DURING THE REORGANIZATION CASE

### A.    First Day Relief

On the Petition Date, the Debtor Filed a number of motions (the "First Day Motions"), which are described briefly below. The First Day Motions were designed to meet the Debtor's goals of:

- continuing its operations in chapter 11 with as little disruption and loss of productivity as possible;

- maintaining the confidence and support of customers, employees, vendors, suppliers, service providers, contractors and other key groups;

- maintaining good relations in the communities served by the Debtor's business; and

- obtaining necessary postpetition financing and use of cash collateral.

The First Day Motions included:

- a motion to authorize payment of prepetition wages and other benefits to the Debtor's employees;

- a motion to authorize payment of certain prepetition trade claims;

- a motion to authorize emergency, interim and final approval of the DIP Facility and use of cash collateral; and

- a motion to authorize continued use of the Debtor's existing cash management system, bank accounts, business forms and investment and deposit guidelines.

     **1.    All of the Debtor's First Day Motions were granted in whole or in part, as described below.**

     **2.    Employee Wages and Benefits**

This motion sought authorization to:

- pay prepetition employee wages, salaries, overtime pay, contractual compensation, sick pay, vacation pay (including "personal days"), holiday pay and other accrued compensation;

- reimburse prepetition employee business expenses (including travel and lodging);

- make payments for which employee payroll deductions were made;

- make prepetition contributions and pay benefits under employee benefits plans; and

- pay all costs and expenses incident to the foregoing payments and contributions (including payroll-related taxes and processing costs).

The Court granted all relief requested in this motion.

     **3.    Payment of Pre-Petition Trade Claims and Pre-Petition Issued Checks**

     This motion sought authority to pay, in the ordinary course of its business, the pre-petition claims arising from the sale of goods or the rendition of services to the Debtor, of trade creditors that continue to supply the Debtor or its Subsidiaries on a post-petition basis, with goods or services in accordance with their customary and usual credit terms. The customary and usual credit terms requirement referred to (a) the trade terms and practices in effect between such trade creditors and the Debtor as of the Petition Date, but prior to any recent modifications of credit terms that were less favorable to the Debtor, or (b) such other trade terms as agreed by the Debtor and such creditor, or (c) such other trade terms, practices and programs that are at least as favorable as those that were in effect during such time in the Debtor's sole discretion.

Case 1-04-12295-CLB, Doc 185, Filed 06/22/04, Entered 06/22/04 17:15:21, Description: Main Document , Page 27 of 61

The motion also requested that all applicable banks and other financial institutions be authorized and directed, when requested by the Debtor, in the Debtor's sole discretion, to receive, process, honor and pay any and all prepetition issued and/or dated checks drawn on the Debtor's accounts, whether or not such checks were presented for payment prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

The Court granted all relief requested in this motion.

### 4.     Cash Management Motion

This motion sought an order:

- approving the Debtor's continued use of its current cash management systems, as such systems may be modified pursuant to the requirements of the DIP Facility;

- approving the continuation of certain ordinary course intercompany transactions with and transfers to the Subsidiaries;

- approving the continued use of the Debtor's (a) existing bank accounts, (b) existing business forms and (c) current investment and deposit guidelines; and (iv) according superpriority status to certain postpetition intercompany claims against the Debtor.

With respect to the parts of the motion that sought authority to (1) continue to use the Debtor's current cash management system, as such system may be modified pursuant to the requirements of the DIP Facility, and (2) continue to use the Debtor's existing checks and other business forms, without alteration, and without the requirement to include the legend "Debtor-in-Possession" or a "debtor-in-possession number" on such checks and business forms, the Court adjourned the motion until the date of the Final Hearing on the Debtor's motion for debtor-in-possession financing (see below). The balance of this motion was granted.

### 5.     Debtor-in-Possession Financing and Use of Cash Collateral

In connection with its preparations for the Filing of the Reorganization Case, the Debtor determined that it would need to use cash collateral and obtain the DIP Facility in the principal amount of up to $15,000,000, to fund, in combination with cash generated from operations, its operating, working capital and capital expenditure needs during the course of this Reorganization Case. Based upon its discussions with the DIP Lenders and with other potential lenders, the Debtor, in its sound business judgment, determined that the financing on the terms and conditions set forth in the DIP Financing Term Sheet attached as part of Exhibit A to the motion was the best, and probably the only, alternative under the circumstances.

The salient terms of the DIP Facility are:

- Borrower:  Bush Industries, Inc.

- Lenders:  JPMorgan Chase Bank, Bear Stearns Investment Products, Inc., B IV Capital Partners, LP, GMAM Investment Funds Trust II, Newstart Factors, Inc., and Sea Pines Funding LLC.

- Maximum Loan Amount:  $15 million, less the Carve-Out.

- Maturity Date:  The earliest to occur of: (i) September 30, 2004; (ii) thirty days after the entry of the Interim DIP Order if a Final DIP Order is not entered; (iii) the effective date of a plan of reorganization for the Borrower; (iv) the date of termination of the Commitments as an exercise of remedies based upon an Event of Default; and (v) the date upon which the sale of all or substantially all of the assets of the Debtor is consummated pursuant to Section 363 of the Bankruptcy Code in accordance with the terms of an order of the Bankruptcy Court.

- Interest Rate:  All advances under the DIP Financing Agreement shall bear interest at a rate per annum equal to the Prime Rate (defined below) plus 2.00%; provided that for so long as the total outstandings under the DIP Financing Agreement exceed $10,000,000, each loan or portion thereof which comprises such excess shall bear interest at a rate per annum equal to the Prime Rate plus 3.00%.  The Prime Rate shall be the rate publicly announced by JPMorgan Chase Bank in New York, NY as its Prime Rate.

- Unused Commitment Fee:  Computed at a rate of one-half of one percent (0.5%) per annum on the average daily unused total commitment, payable in arrears at the end of each month.

- Facility Fee:  $450,000, payable (a) 50% on the date Bush Industries, Inc. executes a commitment letter and (b) 50% on the Closing Date.

- Structuring Fee:  $50,000 payable on the Commitment Date to JPMorgan Chase Bank.

- Work Fee  $16,667 per month, payable monthly in advance to the Administrative Agent on the Closing Date and on the first day of each month of the Borrower thereafter.

- Use of Proceeds:  To fund the working capital needs of the Borrower in the ordinary course of business.

- Collateral:  First priority liens on all currently owned and after acquired assets and property of all of the Debtor, subject only to: (i) Permitted Priority Liens and (ii) a carve-out for payment of Priority Professional Expenses (as defined in the Final DIP Order) and U.S. Trustee fees payable under 28 U.S.C. §1930(a).

- Superpriority Expense of Administration: In accordance with section 364(c)(1) of the Bankruptcy Code, claims under the DIP Financing Agreement will be superior to all other administrative claims in the chapter 11 cases, except for payment of (i) the allowed professional fees and expenses incurred by the Debtor and any official committee appointed in this chapter 11 case, in an aggregate amount at any time outstanding as set forth in the DIP Financing Agreement and (ii) U.S. Trustee fees payable under 28 U.S.C. §1930(a).

On the Petition Date, the Debtor moved for emergency authority to use cash collateral and to borrow up to $5,000,000 under the terms of the DIP Financing Facility Term Sheet, and to schedule interim and final hearings on that motion. At the emergency hearing, HSBC, one of the Prepetition Credit Facility Lenders, objected to the borrowing aspect of the motion to the extent that a priming lien was to be granted in favor of the DIP Lenders which would prime the liens securing the Prepetition Credit Facility.

Following the emergency hearing, the Court issued two emergency orders. The first authorized the Debtor to use cash collateral on a limited basis to fund certain expenditures subject to a further hearing, granted adequate protection by way of a general and continuing replacement lien and security interest in the Debtor's Postpetition inventory and accounts to the extent of the cash collateral used by the Debtor, but subordinate to any liens granted to the Lenders in connection with the emergency debtor in possession financing order (described below), and scheduled the interim hearing on April 5, 2004.

The second emergency order authorized the Debtor to borrow up to $5,000,000 on the terms of the DIP Financing Term Sheet for the purpose of paying certain expenditures, subject to a further hearing, granted the DIP Lenders (a) a superpriority administrative expense claim having priority over any and all administrative expenses (the "Super-Priority Claim") and (b) first priority priming liens on and security interests in any and all of the Debtor's property, assets of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created on all of Debtor's assets, but only to the extent of any advances made by the Lenders to Debtor under the DIP Facility (the "Priming Liens"), and scheduled the interim hearing on April 5, 2004.

At the interim hearing on April 5, 2005, HSBC raised the same objection that it had previously raised at the emergency hearing. Following the interim hearing, the Court issued two interim orders. The Court issued an interim order which extended the Debtor's authority to use cash collateral for the purpose of paying certain expenditures, subject to a further hearing, on the same general terms as previously granted under the emergency order, and scheduled the final hearing on April 26, 2004.

The Court also issued an interim order which authorized the Debtor to borrow up to $8,614,000 for the purpose of paying certain expenditures, subject to a further hearing, granted the Lenders the same Super-Priority Claim and Priming Liens as previously granted following the emergency hearing, and scheduled the final hearing on April 26, 2004.

Following the Final Hearing, the Court overruled the objections of HSBC and the Equity Committee and entered the Final DIP Order and the Final Cash Collateral Order.

**B.** **Additional Requests for Relief During Early Stages of Case**

**1.** **Retention of Debtor's Counsel**

An Application seeking the appointment of Hodgson Russ LLP as bankruptcy counsel to the Debtor, pursuant to section 327 of the Bankruptcy Code, was filed and, following a hearing, was approved by the Court on May 11, 2004.

**2.** **Employment Contract with FTI and Designation of Michael C. Buenzow as Interim CEO**

A Motion seeking the authority to (i) employ FTI (together with its wholly owned subsidiaries, agents, independent contractors and employees "FTI") as crisis managers to the Debtor, in accordance with the terms of its pre-petition contracts with the Debtor nunc pro tunc to the Petition Date, pursuant to section 363 of the Bankruptcy Code, (ii) authorizing the assumption of such pre-petition contracts with the Debtor, pursuant to section 365 of the Bankruptcy Code, and (iii) designating Michael C. Buenzow as chief executive officer of the Debtor and Debtor In Possession nunc pro tunc to the Petition Date, was filed and, following a hearing, was approved by the Court on May 11, 2004.

**3.** **Ordinary Course Professionals Motion**

The Debtor's employees, in the day-to-day performance of their duties, regularly call upon certain professionals, including attorneys, accountants, brokers, communications and public relations professionals, human resources consultants, information technology and systems consultants, insurance advisors and other professionals (collectively, the "Ordinary Course Professionals"), to assist them in carrying out their assigned responsibilities.  The Debtor filed a motion authorizing the Debtor to retain, employ and pay such professionals in the ordinary course of its business without requiring that each separately apply for authority under section 327 of the Bankruptcy Code.  The motion provides that if the fees of such an ordinary course professional exceed $25,000 during any monthly reporting period, the Debtor will seek to retain that professional pursuant to the relevant provisions of the Bankruptcy Code, including, without limitation, section 327 of the Bankruptcy Code.  Following a hearing, the Court granted the motion on May 11, 2004.

**4.** **Schedules and Statements of Financial Affairs**

On April 15, 2004, the Debtor Filed its Schedules of Assets and Liabilities (the "Schedules"), identifying the assets and liabilities of its Estate and other financial information.

**5.** **Claims Process and Bar Dates**

On May 3, 2004, the Bankruptcy Court set June 2, 2004 as the last date for holders of Claims against the Debtor to file proofs of Claims.

### C.     Appointment of Committees

#### 1.     Creditors Committee

On April 19, 2004, the Office of the United States Trustee appointed the Creditors Committee.  The following are the members of the Creditors Committee:

| | |
|---|---|
| Comtrad | Thermal Foams Inc. |
| Jamestown Container | Toppan Industries. |

#### 2.     Equity Committee

On May 7, 2004, the Office of the United States Trustee appointed the Equity Committee.  The following are the members of the Equity Committee:

| | |
|---|---|
| Bruce Galloway | Randall E. Green |
| Sheldon M. Goldman | David Miller |
| Steve Schuster | Fred Knoll |

## V.     THE REORGANIZED DEBTOR

### A.     Business of the Reorganized Debtor

Following the Effective Date of the Plan, the Reorganized Debtor will continue to operate the existing businesses of the Debtor and Subsidiaries. The Reorganized Debtor's principal executive offices will be located in Jamestown, New York.

### B.     Liquidity and Capital Resources

The consummation of the transactions contemplated by the Plan will result in a net reduction of approximately $76 million of total indebtedness.  Management of the Debtor believes that, assuming consummation of the Plan in accordance with its terms, the Reorganized Debtor will have sufficient liquidity to service the post-reorganization indebtedness and conduct its business as contemplated by the Plan.  It is currently contemplated that on the Effective Date, the Reorganized Debtor would have access to the $20 million Revolver to fund its working capital needs (less any amount used to pay the outstanding balance of the DIP Facility).

### C.     Selected Historical Financial Information

Attached as Exhibit B-1 and Exhibit B-2 are the consolidated financial statements for the Debtor and its Subsidiaries as of and for (i) the fiscal years 2002 and 2001, and

Case 1-04-12295-CLB,    Doc 185,    Filed 06/22/04,   Entered 06/22/04 17:15:21,
Description: Main Document  , Page 32 of 61

(ii) the fiscal year 2003, respectively, which were prepared in accordance with U.S. generally accepted accounting principles ("GAAP").

### D. Projected Financial Information

As a condition to confirmation of a plan of reorganization, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtor's management analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan with sufficient liquidity and capital resources to conduct its business. In that connection, the Debtor's management developed and prepared certain projections (the "Projections") which are attached as Exhibit C. The Projections include: (i) a projected reorganized balance sheet as of December 31, 2004, including reorganization and the estimated consolidated financial position, (ii) projected results of operations and statements of cash flows, together with certain other items for the fiscal years 2004 through 2009 (the "Projection Period").

### E. Management and Board of Directors

#### 1. The Reorganized Debtor's Board of Directors

The Bylaws of the Reorganized Debtor (the "Reorganized Debtor Bylaws") will provide that the business and affairs of the Reorganized Debtor will be managed under the direction of the Reorganized Debtor's Board of Directors, which will consist of the individuals appointed by the holders of the Allowed Class 3 Claims (who will be the holders of the New Common Stock) and identified in the Plan Supplement, which will be filed with the Bankruptcy Court within five (5) days prior to the Confirmation Hearing. The Plan Supplement will also contain a discussion of the compensation and other benefits to be received by the directors of the Reorganized Debtor. The initial directors of the Reorganized Debtor will be designated in accordance with the terms of the Shareholders' Agreement.

#### 2. The Reorganized Debtor's Executive Officers

The executive officers of the Reorganized Debtor following the Effective Date are presently expected to include each of the individuals to be identified in the Plan Supplement, which will be filed with the Bankruptcy Court within five (5) days prior to the Confirmation Hearing. The Plan Supplement will also contain a discussion of the compensation and other benefits to be received by the executive officers of the Reorganized Debtor.

#### 3. Paul S. Bush's Role with the Debtor and Reorganized Debtor

Paul S. Bush resigned as Chairman, Chief Executive Officer and director of the Debtor and its Subsidiaries effective as of March 29, 2004. However, Mr. Bush will continue to serve as an employee of the Debtor and the Reorganized Debtor. In his

capacity as an advisor to the Debtor and the Reorganized Debtor, Mr. Bush will, among other things, advise on and/or assist with retaining and strengthening customer, vendor and other relationships, and identifying strategic opportunities. As of the Effective Date, Mr. Bush will be an employee pursuant to the terms of an employment agreement which will be attached as an exhibit to the Plan Supplement, which will be filed with the Bankruptcy Court within five (5) days prior to the Confirmation Hearing. An outline of the business terms of the employment agreement is annexed as Schedule 2, Attachment 1, to exhibit A of the Lock-Up and Voting Agreement, which is annexed as Exhibit A to this Disclosure Statement. Among other terms, Mr. Bush will be precluded from competing with the Debtor and Reorganized Debtor for a period of 48 months from the Effective Date.

## VI.   THE NEW COMMON STOCK AND POST-REORGANIZATION INDEBTEDNESS

### A.   Reorganization Value

The Debtor has been advised by FTI with respect to the reorganization enterprise value of the Reorganized Debtor, which FTI estimates to range between $ 90 million and $100 million as of July 31, 2004.

The reorganization equity value was estimated by the Debtor and FTI to be $ 37 million as of an assumed Effective Date of July 31, 2004, after giving effect to the Debtor's operating business, the expected present value of certain non-operating assets and the debt balances resulting from the proposed restructuring at and beyond the Effective Date. Such reorganization equity value reflects, among other factors discussed below, current financial market conditions and assumptions and risks related to the Projections. See "Projected Financial Information."

The foregoing valuations also reflect a number of assumptions, including a successful reorganization of the Debtor's business in a timely manner, the results reflected in the Projections, the utilization of operating losses to offset certain one-time gains, the amount of available cash, market conditions and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

In preparing the estimated reorganization enterprise value, the following factors were considered:

- certain historical financial information of the Debtor for recent years and interim periods;

- certain internal financial and operating data of the Debtor, including financial projections relating to its business and prospects;

- discussions with certain members of senior management of the Debtor relating to the Debtor's operations and future prospects; and

- certain economic and industry information relevant to the Debtor's operating business.

Although FTI conducted a review and analysis of the Debtor's business, operating assets and liabilities and business plans, they assumed and relied on the accuracy and completeness of all publicly available information and financial and other information furnished by the Debtor and by other firms retained by the Debtor.

Estimates of reorganization enterprise value and equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were to be sold. The estimate of reorganization enterprise value prepared by FTI assumes that the Reorganized Debtor continues as the owner and operator of its business and assets. Such estimates were developed solely for purposes of formulation and negotiation of a plan of reorganization and analysis of implied relative recoveries to creditors thereunder. Such estimates reflect computations of the estimated reorganization enterprise value of the Reorganized Debtor through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale or issuance of any securities pursuant to the Plan, which may be significantly different from the amounts set forth herein. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of reorganization enterprise and equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Debtor nor any other person assumes responsibility for their accuracy.

## B. New Common Stock

As of the Effective Date, the Reorganized Debtor will be authorized to issue 5,000,0000 shares of New Common Stock, of which 1,000,000 shares, which represent all issued and outstanding shares of New Common Stock on the Effective Date, will be distributed, on a Pro Rata Basis, to holders of Allowed Class 3 Claims. Holders of New Common Stock will be entitled to such dividends as may be declared from time to time by the Reorganized Debtor's Board of Directors. However, it is not presently anticipated that dividends will be paid on New Common Stock in the foreseeable future. Each holder of New Common Stock will be entitled to one vote for each share owned by such holder on all matters submitted to a vote of the stockholders of the Reorganized Debtor. These shares will not be entitled to cumulative voting rights. In the event of a liquidation, dissolution or winding up of the Reorganized Debtor, holders of New Common Stock will be entitled to share equally and ratably in any assets remaining after the payment of all debt and liabilities. Holders of New Common Stock will have no preemptive or other subscription or conversions rights. New Common Stock is not subject to redemption. All of the outstanding shares of New Common Stock to be issued pursuant to the Plan will be, upon such issuance, validly issued, fully paid and non-assessable.

## VII. RISK FACTORS

A.      Certain Bankruptcy Considerations

        1.      Parties in interest, including HSBC, may object to the Debtor's classifications

        Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class.  The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  HSBC may contest the classification of its Claims as Class 3 Claims.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

        2.      The chapter 11 filing may disrupt the Company's operations

        The impact, if any, that the Reorganization Case may have on the operations of the Reorganized Debtor cannot be accurately predicted or quantified.  The Reorganization Case, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could adversely affect the Debtor's relationship with its customers, suppliers and employees.  In addition, a prolonged Reorganization Case could result in, among other things, increased costs for professional fees and similar expenses and may make it more difficult for the Debtor to retain and attract management and other key personnel and would require senior management to spend an excessive amount of time and effort dealing with the Debtor's financial problems instead of focusing on the operation of its business.

        3.      The Debtor may not be able to obtain Confirmation.

        There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity holder of the Debtor might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.

        Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to Class 5, that the Plan "does not unfairly discriminate" and that Confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of Claims and Interests within a particular Class under the Plan will not be less than the value of distributions such holders would have received if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

        The Equity Committee expects to object to confirmation of the Plan on the grounds that it believes the Plan violates §1129(b) of the Bankruptcy Code based upon

the allegation that holders of Class 3 Claims are receiving in excess of 100% of their claims plus accrued interest under the Plan while Class 5 Interests in the Debtor are being improperly extinguished.

Confirmation of the Plan is also subject to certain conditions as described above. If the Plan is not confirmed, it is unclear whether a restructuring of the Debtor could be implemented and what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests. If an alternative reorganization could not be agreed to, it is possible that the Debtor would have to liquidate its assets, in which case it is likely that holders of Claims and Interests would receive substantially less favorable treatment than they would have received under the Plan.

4.     **The Debtor may not be able to consummate the Plan.**

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order and the negotiation and execution of certain documents pertaining to the Revolver, the BNA Term Note, the Rohr Term Note and the LC Rollover Financing Facility. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions will be met (or waived) or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Bankruptcy Court confirms the Plan, there can be no assurance that the Plan will be consummated. If a liquidation or protracted reorganization were to occur, there is a risk that the value of the Debtor's business would be eroded to the detriment of all stakeholders.

5.     **Conditions to the Effective Date may not be satisfied on time**

If the conditions to the Effective Date have not been satisfied or waived by August 20, 2004, the DIP Lenders would no longer be bound by the terms and conditions of the Lock Up and Voting Agreement and, therefore, there would be a risk as to the Debtor's ability to successfully reorganize in accordance with the terms of the Plan.

B.     **Factors Affecting the Value of the New Common Stock**

1.     **The Reorganized Debtor may not be able to achieve the projected financial results.**

The Reorganized Debtor may not be able to meet its projected financial results or achieve the revenue or cash flow that it has assumed in projecting its future business prospects. If the Reorganized Debtor does not achieve these projected revenue or cash flow levels, it may lack sufficient liquidity to continue operating as planned after the Effective Date. The Debtor's Projections represent management's view based on current known facts and hypothetical assumptions about the Reorganized Debtor's future operations. The Projections do not guarantee the Reorganized Debtor's future financial performance.

The Reorganized Debtor may not be able to meet its post-reorganization debt obligations and finance all of its operating expenses, working capital needs and capital expenditures. The Debtor is currently highly leveraged. Even after the reorganization,

the Reorganized Debtor will have a significant amount of debt which will continue to require significant interest and principal payments. The Reorganized Debtor may not generate sufficient positive cash flow to support the debt. The Reorganized Debtor's level of debt and the limitations imposed on it by the Reorganized Debtor's debt agreements could adversely affect the Reorganized Debtor's operating flexibility and put the Reorganized Debtor at a competitive disadvantage. The Reorganized Debtor's significant level of debt may adversely affect the Reorganized Debtor's future performance, because, among other things:

- the Reorganized Debtor may not be able to take advantage of business opportunities;

- the Reorganized Debtor may be disadvantaged compared to competitors with less leverage; and

- the Reorganized Debtor may be more vulnerable to adverse economic conditions.

The Revolver, the BNA Term Note, the Rohr Term Note and the LC Rollover Financing Facility will likely contain a number of significant financial and other restrictive covenants. These covenants could adversely affect the Reorganized Debtor by limiting the Reorganized Debtor's financial and operating flexibility as well as its ability to plan for and react to market conditions and to meet its capital needs. The Reorganized Debtor's failure to comply with these covenants could result in events of default which, if not cured or waived, could result in the Reorganized Debtor's being required to repay such indebtedness before its stated maturity date, and the Reorganized Debtor cannot assure that it would have the financial resources or be able to arrange alternative financing to do so.

### 2. The Reorganization Case may increase the tax liability of the Reorganized Debtor

The U.S. federal income tax consequences of consummation of the Plan to holders of Claims or Interests are complex and subject to uncertainty. Certain tax attributes of the Debtor, including net operating loss carryovers, may be reduced or eliminated as a consequence of the Plan. The elimination or reduction of net operating loss carryovers and such other tax attributes may increase the amount of tax payable by the Reorganized Debtor following the consummation of the Plan as compared with the amount of tax payable had no such reduction been required. See Article XI, "Certain U.S. Federal Income Tax Consequences".

### 3. Additional Factors Previously Disclosed

Various other factors, which are described in the Debtor's annual report on Form 10-K and certain other filings made with the Securities and Exchange Commission, should be considered, as they may affect the value of the New Common Stock.

### C. Projections, Business Plan and Reorganization Value

The fundamental premise of the Plan is the successful implementation of the Business Plan, as reflected in the Projections. The Projections and reorganization enterprise value are inherently uncertain and are dependent upon the successful implementation of the Business Plan and the reliability of the other assumptions contained therein. The Projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Reorganized Debtor and some of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement, including unanticipated changes in applicable regulations or GAAP, may affect the actual financial condition, results of operations and cash flows of the Reorganized Debtor in the future.

## VIII. GENERAL INFORMATION CONCERNING THE PLAN

Confirmation of the Plan and the occurrence of the Effective Date will result in the release and discharge of certain Claims and Interests and the creation of related injunctions with respect thereto. These legal effects of the Plan are set forth in Articles IV and X of the Plan and are described below.

### A. Releases

#### 1. General Releases by Holders of Claims or Interests

As of the Effective Date, in consideration for the obligations of the Debtor and the Reorganized Debtor under the Plan, the distributions to be made under the Plan and other contracts, instruments, releases, agreements or documents to be entered into, or delivered in connection with, the Plan, (a) each holder of a Claim or Interest that votes in favor of the Plan or who is deemed to vote in favor of the Plan and (b) each entity that has held, holds or may hold a Claim or Interest or at any time was a creditor or stockholder of the Debtor and that does not vote on the Plan or votes against the Plan, will be deemed to forever release, waive and discharge all claims (as such term is defined in section 101(5) of the Bankruptcy Code, including Derivative Claims), obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution and rights of indemnification, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on, or prior to, the Effective Date in any way relating to the Debtor, the Prepetition Credit Facility, the DIP Facility, the LC Rollover Financing Facility, the Revolver or the Reorganization Case or the Plan that such entity has, had or may have against any of the Debtor, the DIP Lenders, the Revolver Participating Lenders and each of their respective present or former directors, officers, employees, attorneys, accountants, underwriters, investment bankers, financial advisors and agents, acting in such capacity (which release will be in addition to the

discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code).

## 2. General Releases by the Debtor

### a. Against the DIP Lenders and the Revolver Participating Lenders

As of the Effective Date, in consideration for the establishment and availability of the DIP Facility, the LC Rollover Financing Facility and the Revolver, the Debtor and its Subsidiaries, the Estate and the Reorganized Debtor and its Subsidiaries will be deemed to forever release, waive and discharge all claims (as such term is defined in section 101(5) of the Bankruptcy Code, including Derivative Claims), obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution and rights of indemnification whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on, or prior to, the Effective Date in any way relating to the Reorganization Case, the Plan, the Prepetition Credit Facility or the DIP Facility, the Revolver or the LC Rollover Financing Facility, that the Debtor has, had or may have against any of the DIP Lenders, or the Revolver Participating Lenders and each of their respective present or former directors, officers, employees, attorneys, accountants, underwriters, investment bankers, financial advisors and agents, acting in such capacity.

### b. Against Recipients of Preferential Transfers

As of the Effective Date, in consideration for the provisions of the Plan, the Debtor and its Estate and the Reorganized Debtor, to the fullest extent permissible under applicable law, as such law may be extended subsequent to the Effective Date, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution and rights of indemnification whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on section 547 of the Bankruptcy Code that the Debtor has, had or may have against any Person or entity.

### c. Against the Debtor's Current and Former Directors, Officers and Employees

As of the Effective Date, the Debtor will be deemed to forever release, waive and discharge all claims (as such term is defined in section 101(5) of the Bankruptcy Code, including Derivative Claims), obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution and rights of indemnification, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other

occurrence, taking place on, or prior to, the Effective Date in any way relating to the Debtor, the Reorganization Case or the Plan, that the Debtor has, had or may have against their respective present or former directors, officers or employees, so long as such released person acted honestly and in good faith with a view to the best interests of the Debtor in relation to any such act, omission, transaction or other occurrence; provided, however, that any claims against any of the current and former directors, officers or employees of the Debtor and their Subsidiaries covered by available insurance are preserved, but only to the extent of the available insurance coverage.

### d.    Objection by HSBC

HSBC and the Equity Committee have advised the Debtor that they believe the proposed third-party releases contained in the Plan are in violation of Bankruptcy Code §524.  HSBC and the Equity Committee may contest the jurisdiction of the Bankruptcy Court to approve the release of non-debtor third parties from liability to the Debtor's creditors or to supplement such releases by injunctions that permanently bar creditors from pursuing the released non-debtors.

### B.    Exculpation/Limitation of Liability

The Debtor, the Reorganized Debtor and their respective directors, officers, employees and professionals, acting in such capacity; the DIP Lenders, the Revolver Participating Lenders and their respective directors, officers, employees and professionals, acting in such capacity; the Creditors' Committee and the Equity Committee, their respective members and professionals and each of their respective directors, officers, employees and professionals; will neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with or related to the Reorganization Case or formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan or the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan; *provided, however*, that the foregoing provisions of this Article VIII.B will have no effect on:  (1) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (2) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

### C. Injunction Related to Releases/Exculpation

The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims (as such term is defined in section 101(5) of the Bankruptcy Code, including Derivative Claims), obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities against the persons or entities released and/or exculpated pursuant to the Plan.

### D. Discharge of Claims and Termination of Interests; Related Injunction

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for, and in complete satisfaction, discharge and release of, all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date:

- discharge the Debtor from all Claims or other debts that arose on or before the Effective Date, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan; and

- terminate all Interests and other rights of equity security holders, including Old Common Stock, in the Debtor.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims against the Debtor and a termination of all Interests and other rights of equity security holders in the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a Claim that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such discharged Claims, or terminated Interests:

- commencing or continuing in any manner any action or other proceeding against the Debtor, the Reorganized Debtor or their respective property, other than to enforce any right pursuant to the Plan to a distribution;

- enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor or their respective property, other than as permitted pursuant to the Plan;

- creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Reorganized Debtor or their respective property;

- asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or the Reorganized Debtor; and

- commencing or continuing any action, in any manner, in any place that does not comply or is inconsistent with the provisions of the Plan.

As of the Effective Date, all entities that have held, currently hold or may hold any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities:

- commencing or continuing in any manner any action or other proceeding;

- enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order;

- creating, perfecting or enforcing any lien or encumbrance;

- asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and

- commencing or continuing any action, in any manner, in any place that does not comply or is inconsistent with the provisions of the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Articles IV and X of the Plan.

**E.    Preservation of Rights of Action by the Debtor and the Reorganized Debtor**

Except as otherwise provided in the Plan, in the Confirmation Order or in any contract, instrument, release or other agreement entered into, or delivered in connection with, the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor will retain and may enforce any claims, demands, rights and causes of action that the Debtor or its Estate may hold against any entity, including Recovery Actions, other than actions under section 547 of the Bankruptcy Code, against any person

or entity, to the extent not released under Article IV of the Plan.  The Reorganized Debtor or its successors may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtor or its successors holding such claims, demands, rights or causes of action.

### F.    Cancellation and Surrender of Instruments, Securities and Other Documentation

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all notes and other debt instruments, if any, issued pursuant to the Prepetition Credit Facility, and all certificates evidencing Interests, will be canceled and of no further force and effect, without any further action on the part of the Debtor or the Reorganized Debtor.  The holders of, or parties to, such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

### G.    Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan (including, without limitation, the Revolver, the BNA Term Note, the Rohr Term Note, and the LC Rollover Financing Facility), on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtor and its successors and assigns.

### H.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Chief Executive Officer, President, Chief Financial Officer, Treasurer and any other such officer (as determined by the board of directors of the Debtor or Reorganized Debtor) of the Debtor or Reorganized Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases, security agreements, financing statements, notes, credit agreements, mortgages, deeds of trust and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The Secretary of the Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax or similar tax:  (a) the issuance, transfer or exchange of New Common Stock; (b) the creation of any mortgage, deed of trust, lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the

execution and delivery of the Revolver, the BNA Term Note, the Rohr Term Note and the LC Rollover Financing Facility; or (e) the making or delivery of any other instrument under, in furtherance of or in connection with the Plan, including any merger agreements, continuance certificates, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, conveyances, transfers, bills of sale or assignments executed in connection with any transaction contemplated by the Plan.

## I.    Executory Contracts and Unexpired Leases

Pursuant to section 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts and Unexpired Leases that exist between the Debtor and any person or entity shall be deemed assumed by the Debtor, as of the Effective Date, except for any Executory Contract or Unexpired Lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective and for which the motion was filed prior to the Confirmation Date; (ii) as to which a motion for approval of the rejection of such Executory Contract or Unexpired Lease has been filed and served prior to the Confirmation Date; or (iii) that is specifically designated as a contract or lease to be rejected on Exhibit G to the Plan.  The Debtor reserves the right, at any time prior to the Effective Date, to amend Exhibit G to the Plan to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant to Article V.A.1 of the Plan; or (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to Article V.A.1 of the Plan.  The Debtor will provide notice of any amendments to Exhibit G to the Plan to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Case.  Each contract and lease listed on Exhibit G to the Plan will be rejected only to the extent that any such contract or lease constitutes, as of the Effective Date, an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit G will not constitute an admission by the Debtor or Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor has any liability thereunder.  Unless otherwise specified on Exhibit G to the Plan, each Executory Contract and Unexpired Lease listed or to be listed on Exhibit G to the Plan shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by an agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on Exhibit G to the Plan.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in Article V.A and Article V.D. of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  An order of the Bankruptcy Court entered on or prior to the Confirmation Date will specify the procedures for providing notice to each non-Debtor party to any Executory Contract or Unexpired Lease being assumed pursuant to the Plan of:  (a) the contract or lease being assumed; (b) the Cure Amount Claim, if any, that the Debtor believes it is obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or the assignee of the Debtor, if any, (1) by payment of the Cure Amount Claim in Cash on the Effective Date or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (1) the amount of any Cure Amount Claim; (2) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to Article V.A.1 of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtor, the Reorganized Debtor, their respective successors or their respective properties unless a proof of Claim is Filed and served on the Reorganized Debtor, pursuant to the procedures specified in the Confirmation Order and the notice of the entry of the Confirmation Order or another order of the Bankruptcy Court, no later than 30 days after the Effective Date.

Contracts and leases entered into after the Petition Date by the Debtor and any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## IX.   DISTRIBUTIONS UNDER THE PLAN

### A.   General

Except as otherwise provided in the Plan, distributions of Cash and New Common Stock to be made on the Effective Date to holders of Claims that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (a) 60 days after the Effective Date or (b) such later date when the applicable conditions of Article V of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Article VI.B of the Plan (regarding undeliverable distributions) or Article IV.K of the Plan (regarding surrender of canceled instruments and securities) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Article VII of the Plan. All distributions to holders of Allowed Claims entitled to distributions under the Plan shall be allocated first to the principal amount of the holder's Allowed Claim, and only if the entire principal amount of the holder's Allowed Claim has been paid, then to any unpaid fees and expenses associated

with any such Allowed Claim and then to the unpaid pre-Effective Date interest (if any) on such Allowed Claim.

## B. Methods of Distributions

The method of distributing the consideration provided for in the Plan is set forth in Article VI of the Plan and summarized below.

### 1. Delivery of Distributions in General

Except as provided in the Plan, distributions to holders of Allowed Claims will be made (a) for Allowed Claims in Class 4, at the addresses set forth on the respective proofs of claim Filed by holders of such Claims; (b) for Allowed Claims in Class 3, to the Administrative Agent on behalf of the holders of Allowed Claims in Class 3 in accordance with the Prepetition Credit Facility; (c) at the addresses set forth in any written certification of address change delivered to the Debtor or Reorganized Debtor after the date of Filing of any related proof of Claim; or (d) at the addresses reflected in the Debtor's Schedules if no proof of Claim has been Filed and the Debtor or Reorganized Debtor has not received a written notice of a change of address.

## C. Undeliverable or Unclaimed Distributions

If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions will be made to such holder unless and until the Debtor or Reorganized Debtor is notified by written certification of such holder's then-current address. Subject to Article VI.B of the Plan, undeliverable distributions will remain in the possession of the Debtor pursuant to Article VI.B of the Plan until such time as a distribution becomes deliverable. Undeliverable Cash will be held in segregated bank accounts in the name of the Debtor or Reorganized Debtor for the benefit of the potential claimants of such funds. The Debtor or Reorganized Debtor holding undeliverable Cash will invest such Cash in a manner consistent with the Reorganized Debtor's investment and deposit guidelines. Undeliverable New Common Stock will be held by the Administrative Agent for the benefit of the potential claimants thereof.

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable distribution to be made within two years after the later of (a) the Effective Date and (b) the last date on which a distribution was deliverable to such holder, will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtor or its respective property. All unclaimed shares of New Common Stock shall be returned to the Reorganized Debtor and such shares of New Common Stock shall cease to be issued and outstanding. Nothing contained in the Plan will require the Reorganized Debtor to attempt to locate any holder of an Allowed Claim.

## D. Transfers after Confirmation Date

The Debtor or Reorganized Debtor will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the

close of business on the Confirmation Date and will be entitled for all purposes under the Plan to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Confirmation Date. Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims in Class 3 and Class 4 that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Confirmation Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Confirmation Date.

### E.    Setoffs

Except with respect to claims of the Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into, or delivered in connection with the Plan, or any Claims arising under or with respect to the Prepetition Credit Facility, other than as provided for in the Plan, the Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; provided that neither the failure to effect a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtor or Reorganized Debtor of any claims, rights and causes of action that the Debtor or Reorganized Debtor may possess against such a Claim holder.

### F.    Disputed Claims

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

### G.    Objections to Claims or Interests and Authority to Prosecute Objections

If an objection has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.

After the Confirmation Date and prior to the Effective Date, only the Debtor or the Reorganized Debtor will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court. After the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim to the extent

the amount to be paid in respect thereof is less than $50,000 without approval of the Bankruptcy Court.

### H. Dissolution of Committees

On the Effective Date, any committee(s) appointed under section 1102 of the Bankruptcy Code will dissolve, and the members of such committee(s) will be released and discharged from all duties and obligations arising from, or related to, the Reorganization Case. The Professionals retained by any committee(s) will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any application for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Article III of the Plan and in connection with any appeal of the Confirmation Order.

## X. VOTING AND CONFIRMATION PROCEDURE

### A. General

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtor, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtor has complied with the applicable provisions of the Bankruptcy Code;

- the Debtor, as proponent of the Plan, has proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors and equity Interest holders, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code;

- the Plan is feasible and Confirmation will not likely be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a

chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan;

- all fees and expenses payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of such fees when due;

- the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits; and

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers and directors of the Reorganized Debtor have been made.

**B.      Voting Procedures and Requirements for Voting**

Pursuant to the Bankruptcy Code, only Classes of Claims against, or Interests in, a debtor that are "impaired" under the terms of a plan of reorganization are entitled to vote to accept or reject a plan.  A Class is "impaired" if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified, other than by curing defaults and reinstating maturity.  Classes of Claims and Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims and Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan unless such Class otherwise indicates acceptance.

As shown above in "Overview of the Plan — Summary of Classes and Treatment of Claims and Interests", Classes 1, 2 and 4 of the Plan are not impaired, are therefore deemed to have accepted the Plan and are thus not required or entitled to vote on the Plan.  The holders of Class 5 Interests and Class 6 Subordinated Claims, on the other hand, will not receive or retain any property under the Plan.  Class 5 and Class 6, therefore, are deemed to have rejected the Plan and the holders of Class 5 Interests and Class 6 Claims will not be required or entitled to vote on the Plan.  Accordingly, only the holders of Class 3 Claims will be entitled to vote on the Plan and the Debtor will seek "cramdown" with respect to Class 5 and Class 6 at the Confirmation Hearing.

**TO BE COUNTED, CLASS 3 BALLOTS MUST BE ACTUALLY RECEIVED ON OR BEFORE JULY 27, 2004 AT 9:00 A.M. (OR SUCH OTHER TIME AND DATE IDENTIFIED ON SUCH BALLOT) AT THE ADDRESS SET FORTH ON THE BALLOT.**

**C.      Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtor has fulfilled the Confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled to commence on July 27, 2004 at 9:00 a.m. before the Honorable Carl L. Bucki, U.S. Bankruptcy Judge for the Western District of New York, in the Judge's usual courtroom at the U.S. Bankruptcy Court for the Western District of New York, Olympic Towers, 300 Pearl Street, Buffalo, New York 14202. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be Filed and served upon the persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

### D. Confirmation

At the Confirmation Hearing, the Bankruptcy Court will rule on any objection by HSBC or the Equity Committee and will confirm the Plan if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for Confirmation are that the Plan: (a) is accepted by the requisite holders of Class 3 Claims; (b) is determined by the Bankruptcy Court to be "fair and equitable" and to not "discriminate unfairly" as to Class 5 or Class 6; (c) is in the "best interests" of each holder of a Class 5 Interest or Class 6 Subordinated Claim as well as the holders of all Class 3 Claims who vote against the Plan; (d) is feasible; and (e) complies with the applicable provisions of the Bankruptcy Code.

The Equity Committee expects to object to confirmation of the Plan on the grounds that it believes the Plan violates §1129(b) of the Bankruptcy Code based upon the allegation that holders of Class 3 Claims are receiving in excess of 100% of their claims plus accrued interest under the Plan while Class 5 Interests in the Debtor are being improperly extinguished.

### E. Acceptance and Cramdown

A plan is accepted by an impaired class of Claims if holders of at least two-thirds in dollar amount and a majority in number of Claims of that class vote to accept the plan. Only those holders of Claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation. For purposes of determining whether the requisite approval has been received, only the votes in Class 3 will be tabulated. In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that the Plan be accepted by each holder of a Class 3 Claim or that the Plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a Class 3 Claim who votes against the Plan. Section 1129 of the Bankruptcy Code also requires that the Plan be found by the Bankruptcy Court to be in the best interests of each holder of a Class 5 Interest or Class 6 Subordinated Claim.

The Bankruptcy Code contains provisions for Confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of Claims has accepted it. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. As indicated above, the Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 1129 of the Bankruptcy Code, it: (a) is "fair and equitable;" and (b) "does not discriminate unfairly" with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that, unless a dissenting Class of Unsecured Claims or a Class of Interests receives full compensation for its Allowed Claims or Allowed Interests, no holder of Allowed Claims or Interests in any junior Class may receive or retain any property on account of such Claims or Interests. With respect to a dissenting Class of Secured Claims, the "fair and equitable" standard requires, among other things, that holders either (a) retain their liens and receive deferred cash payments with a value as of the Effective Date equal to the value of their interest in property of the Estate or (b) receive the indubitable equivalent of their Secured Claims. The "fair and equitable" standard has also been interpreted to prohibit any Class senior to a dissenting Class from receiving under a plan more than 100% of its Allowed Claims or Allowed Interests. The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with other Classes of equal rank.

The Equity Committee expects to object to the Plan on the grounds that it believes the Plan violates § 1129(b) of the Bankruptcy Code based upon the fact that holders of Class 3 Claims are receiving in excess of 100% of their claims plus accrued interest under the Plan while Class 5 Interests in the Debtor are being improperly extinguished.

The Debtor believes that the Plan is fair and equitable as to Class 5 Interests as (i) no holder of Allowed Claims or Interests in any junior Class will receive or retain any property on account of such Claims or Interests under the Plan and (ii) no Class senior to Class 5 or Class 6 will receive under the Plan more than 100% of its Allowed Claims or Allowed Interests. The Debtor also believes that the Plan does not discriminate unfairly against Class 5 or Class 6 as the Plan does not fail to treat such Classes equally with any other Class of equal rank, since no such other Classes exist. Accordingly, the Debtor intends to invoke the cramdown provisions of section 1129(b)(2)(C) of the Bankruptcy Code at the Confirmation Hearing with respect to Class 5 and Class 6 and ask the Court to confirm the Plan notwithstanding the deemed rejection of the Plan by Class 5 and Class 6.

## F. Modification or Revocation of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtor (with the consent of the Requisite DIP Lenders) or the Reorganized Debtor (with the consent of the Participating Lenders), as applicable, reserves the right to alter, amend or modify the Plan before its substantial consummation. The Debtor also reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan or if Confirmation does

not occur, then, the Plan will be null and void in all respects, and nothing contained in the Plan will:

- constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor; or

- prejudice in any manner the rights of the Debtor or any other party.

### G. Best Interests Test; Liquidation Analysis

To confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class who has not accepted the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan or is deemed to reject the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

HSBC may object to confirmation of the Plan on the grounds that HSBC believes that the Plan violates §1129(a)(7) of the Code based on an allegation that the value of HSBC's distribution under the Plan has a value, as of the Effective Date, less than the amount HSBC would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Reorganization Case was converted to a chapter 7 case under the Bankruptcy Code and the Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to holders of Unsecured Claims and Interests would be reduced by, among other things: (a) the Claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtor's chapter 7 case; (c) unpaid Administrative Claims of the Reorganization Case; and (d) Priority Claims and Priority Tax Claims. The Debtor's costs of liquidation in a chapter 7 case would include the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the operation of the Debtor during the pendency of the chapter 7 case and all unpaid Administrative Claims incurred by the Debtor during the Reorganization Case that are allowed in the chapter 7 cases. The liquidation itself would trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate the payment of

other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

Based on the liquidation analyses set forth in Exhibit D, the Debtor believes that holders of Claims will receive greater value as of the Effective Date under the Plan than such holders would receive under a chapter 7 liquidation and that the holders of Class 5 Interests or Class 6 Subordinated Claims would receive nothing in either event.

In an actual liquidation of the Debtor, distributions to holders of Claims would be made substantially later than the Effective Date assumed in connection with the Plan. This delay would materially reduce the amount determined on a present value basis available for distribution to creditors, including holders of Unsecured Claims. The hypothetical chapter 7 liquidation of the Debtor is assumed to commence on April 1, 2004 and to be substantially completed by September 30, 2004.

In summary, the Debtor believes that a chapter 7 liquidation of the Debtor would result in substantial diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan, because of, among other factors:

- the failure to realize the maximum going concern value of the Debtor's assets;

- the substantial negative impact of conversion to a chapter 7 case and subsequent liquidation on the employees and customers of the Debtor;

- additional costs and expenses involved in the appointment of trustees, and the appointment of attorneys, accountants and other professionals to assist such trustees in the chapter 7 case;

- additional expenses and Claims, some of which would be entitled to priority in payment, which would arise by reason of the liquidation and from the rejection of unexpired real estate leases and other Executory Contracts and Unexpired Leases in connection with a cessation of the Debtor's operations; and

- the substantial time that would elapse before entities would receive any distribution in respect of their Claims.

Consequently, the Debtor believes that the Plan will provide a substantially greater ultimate return to holders of Claims than would a chapter 7 liquidation and the same ultimate return to the holders of Class 5 Interests or Class 6 Subordinated Claims.

## H. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan). For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor has prepared the Projections. See "The Reorganized Debtor — Projected Financial Information." Based upon the Projections, the Debtor believes that its reorganization under the Plan will meet the feasibility requirements of the Bankruptcy Code.

## I. Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtor believes that the Plan complies with all provisions of the Bankruptcy Code.

HSBC has advised the Debtor that it may also object to confirmation of the Plan on the grounds that the Bankruptcy Court lacks jurisdiction to approve a restructuring of or a discharge of Rohr, a non-debtor, of its obligations under the Prepetition Credit Facility.

## J. Alternatives to Confirmation and Consummation of the Plan

The Debtor has evaluated all potential alternatives to the Plan, including alternative structures and terms of the Plan, the liquidation of the Debtor and delaying the adoption of any plan of reorganization. While the Debtor has concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtor, or (subject to the Debtor's exclusivity rights) any other party in interest in the Reorganization Case could attempt to propose a different plan of reorganization. Further, if no plan of reorganization can be confirmed, the Reorganization Case may be converted to a chapter 7 case. In a case under chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtor. The proceeds of the liquidation would be distributed to the creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code.

## XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

### A. General

The Plan will have tax consequences to the Debtor and to holders of Claims and Interests. A summary description of certain federal income tax consequences of the Plan to the Debtor and holders of Class 3 Claims ("Holders") is provided below.

**THE DESCRIPTION BELOW IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND IS SUBJECT TO UNCERTAINTIES. THE DESCRIPTION DOES NOT ADDRESS ALL POTENTIAL FEDERAL INCOME TAX IMPLICATIONS, INCLUDING BUT NOT LIMITED TO, ALTERNATIVE MINIMUM TAX, TREATMENT OF RESTRUCTURING EXPENSES, THE**

**SUBSEQUENT SALE OF NEW COMMON STOCK, CONSOLIDATED RETURN REGULATIONS, OR ISSUES APPLICABLE TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, BANKS, SMALL BUSINESS INVESTMENT COMPANIES, MUTUAL FUNDS, REGULATED INVESTMENT COMPANIES, TAX-EXEMPT ORGANIZATIONS, HOLDERS THAT ARE NOT UNITED STATES TAXPAYERS (AS DEFINED IN SECTION 7701(A)(30) OF THE TAX CODE) AND PERSONS HOLDING CLAIMS AS PART OF A HEDGE, INTEGRATED CONSTRUCTIVE SALE OR STRADDLE. NO OPINION OF COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH RESPECT TO ANY TAX CONSEQUENCES OF THE PLAN AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT. NO RULINGS OR DETERMINATIONS OF THE IRS OR ANY OTHER TAX AUTHORITIES HAVE BEEN OBTAINED OR SOUGHT WITH RESPECT TO THE PLAN, AND THE DESCRIPTION BELOW IS NOT BINDING UPON THE IRS OR SUCH OTHER AUTHORITIES.**

The following discussion of federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. Any such changes or interpretations may be retroactive, and could affect significantly the federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN. FURTHERMORE, NO FEDERAL TAXES OTHER THAN INCOME TAXES ARE ADDRESSED.**

**IN ADDITION, EXCEPT WITH RESPECT TO HOLDERS OF CLASS 3 CLAIMS, NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS ADVISED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

### B.    Federal Income Tax Consequences to the Debtor

The Debtor has material federal income tax net operating loss ("NOL") carryovers that, subject to certain limitations, may be available to offset portions of the Debtor's future taxable income or gain. As discussed below, these tax attributes will be reduced by any gain or income realized as a result of the transactions contemplated by the Plan, including any discharge of indebtedness income ("COI Income") excluded from gross income pursuant to section 108 of the Tax Code and any income resulting from the transactions provided for in the Plan.

Sections 382 and 383 of the Tax Code, as well as the applicable Regulations, contain rules that limit the ability of a loss corporation, following certain changes in direct or indirect ownership of its stock, to offset its pre-ownership change losses and credits against its post-ownership change taxable income. Implementation of the Plan will result in an "ownership change" as defined in section 382 of the Tax Code.

**1.     Discharge of Indebtedness Income and Reduction of Tax Attributes**

In general, discharge of indebtedness produces gross income. However, gross income does not include COI Income if the discharge occurs in a case under the Bankruptcy Code.[3] Amounts excluded from income under this Bankruptcy Code exception must be applied to reduce certain tax attributes. The amount excluded from gross income reduces tax attributes in the following order: (1) any NOL for the taxable year of the discharge, and any NOL carryover to such taxable year; (2) certain general business credit and minimum tax credit carryovers and amounts; (3) any capital loss for the taxable year of the discharge and any capital loss carryovers; (4) tax basis of the Debtor's depreciable and nondepreciable assets; (5) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers. A taxpayer may elect to apply any portion of the reduction of tax attributes first to basis of depreciable property. The Debtor has not yet determined whether or not to make such an election. In general, basis reductions caused by discharge of indebtedness apply to any property held by the taxpayer as of the first day of the tax year following the tax year of the discharge. Attribute reduction is calculated only after the tax for the year of discharge has been determined.

Discharge of certain claims pursuant to the Plan may result in the realization of debt discharge income, which will reduce the tax attributes of the Debtor. The Debtor will be treated as satisfying debt with an amount of money equal to the fair market value of the New Common Stock distributed to the Prepetition Credit Facility Lenders. The Debtor will realize debt discharge income to the extent the amount of the debt discharged in the exchange exceeds the fair market value of the New Common Stock. Similarly, an exchange of old debt for new debt generates debt discharge income to the extent the issue price of the new debt is less than the adjusted issue price of the old debt.

**2.     Limitation on NOL Carryovers and Certain Built-in Losses and Credits Following Ownership Change**

Any NOLs remaining after tax attributes reduction will be subject to limitations on use, as described in this section. Even if there were no debt discharge income, and

---

3 To qualify for this benefit, the taxpayer must be under the jurisdiction of the court in a Title 11 case, and the discharge of indebtedness must be granted by the court or be pursuant to a plan approved by the court.

Case 1-04-12295-CLB,    Doc 185,    Filed 06/22/04,    Entered 06/22/04 17:15:21,
Description: Main Document , Page 57 of 61

therefore no reduction of tax attributes, the Debtor's or Reorganized Debtor's future use of NOLs, certain built-in losses, and certain credits would be limited.

Following an "ownership change" occurring in a Title 11 proceeding, the amount of a corporation's taxable income that can be offset by "pre-change losses" is generally limited annually to its "Tax Code Section 382 (l)(6) amount" (the "L6 Limitation"). A corporation's L6 Limitation is determined by multiplying a prescribed long-term tax exempt rate by the value of the corporation's equity immediately following the ownership change.[4]

An "ownership change" occurs if the percentage of stock of the corporation owned by any one or more "5% shareholders" has increased by more than 50 percentage points when compared to the lowest percentage of stock of the corporation owned by those 5% shareholders at any time during the testing period. The increases in percentage ownership are aggregated for those 5% shareholders whose percentage ownership has increased during the testing period.

A corporation's "pre-change losses" include (1) NOL carryovers to the year of the change; (2) the NOL of the corporation for the year of the change to the extent allocable to the pre-change portion of the year; (3) certain built-in losses and deductions; (4) certain pre-change capital losses; and (5) certain pre-change credits. If the full amount of the L6 Limitation is not used in any year (because it exceeds the corporation's taxable income), the unused amount can be carried forward.

A special exception to the L6 Limitation applies in certain bankruptcy cases where a sufficient amount of new debtor stock is distributed to "qualified creditors." However, this special exception should not apply in this case.

### C.    Certain Federal Income Tax Consequences to Holders of Claims

#### 1.    Recognition of Gain or Loss

The United States federal income tax consequences to Holders will depend on whether the Class 3 Claims are treated as "securities" for purposes of the reorganization provisions of the Tax Code. Whether an instrument is a "security" for these purposes is determined based on all the facts and circumstances, but most authorities have held that the length of the term of the debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including among others, the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of

---

[4] For ownership changes that occur in April, 2004, the applicable rate is 4.31%.

the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. Based on these factors the Class 3 Claims should not be "securities" for United States federal income tax purposes and therefore the exchange should be a taxable exchange to the Holders.

In a taxable exchange a Holder of an Allowed Claim generally will recognize gain or loss equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in the Allowed Claim. The "amount realized" by a Holder is equal to the sum of the Cash and the fair market value of any property received under the Plan in respect of a Holder's Allowed Claim, to the extent that such Cash or property is not allocable to any portion of the Allowed Claim representing accrued but unpaid interest (see discussion below). **HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.**

### 2.     Distributions in Discharge of Accrued but Unpaid Interest

Pursuant to the Plan, Distributions received with respect to Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be treated as receiving taxable interest, to the extent any consideration they receive under the Plan is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan. **HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 3.     Character of Gain or Loss; Tax Basis; Holding Period

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a Holder of Allowed Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the Holder, the nature of the Allowed Claim in such Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period in the Allowed Claim, whether the Allowed Claim was acquired at a market discount and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim.

### D.     Information Reporting and Backup Withholding

All distributions to Holders of Allowed Claims are subject to any applicable withholding requirements. Under the Tax Code's backup withholding rules, interest, dividends and other reportable payments to Holders of Allowed Claims may be subject to back-up withholding at the then applicable rate, which is currently twenty-eight percent (28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to report properly interest or dividends, or (d) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in some cases, corporations and financial institutions. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Claims may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## XII. APPLICABILITY OF CERTAIN U.S. FEDERAL AND STATE SECURITIES LAWS

Following Confirmation and consummation of the Plan, the Reorganized Debtor will be a closely held corporation whose shares will be owned, Pro Rata, by the holders of the Class 3 Claims and will not be publicly held or publicly traded. The Reorganized Debtor will take all actions necessary to ensure that its stock is no longer registered pursuant to applicable Federal or state securities or other law and no longer listed or qualified to be traded on any stock exchange. No registration statement will be filed under any Federal or state securities laws with respect to the distribution under the Plan of the New Common Stock. All subsequent transfers of the New Common Stock will be subject to all applicable restrictions which may apply to the transfer of non registered securities under applicable law. The provisions of section 1145(a)(1) of the Bankruptcy Code, which exempt the offer and distribution of securities under a Plan from Federal and state securities registration requirements, will not be applicable to such subsequent transfers.

## XIII. ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for its full text. Certain documents described or referred to in this Disclosure Statement may not have been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.

[This space intentionally left blank.]

## XIV.   CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that the Confirmation and consummation of the Plan is preferable to all other alternatives.

Dated: June 22, 2004

Respectfully submitted,

**BUSH INDUSTRIES, INC.**

By: /s/ Michael C. Buenzow
Name:  Michael C. Buenzow
Title:    Interim Chief Executive Officer

GBDOCS:  179187 v2 (3%9F02!.DOC)